1  WILLIAM D. PAOLI (SBN 77689)
   COLLIAU ELENIUS MURPHY CARLUCCIO
2    KEENER & MORROW
3  555 Mission Street, Suite 330
   San Francisco, California  94105
4  Telephone:  (415) 932-7000
   Facsimile:  (415) 932-7001
5  E-Mail:  william.paoli@cna.com

6  Attorneys for Plaintiff
7  VALLEY FORGE INSURANCE COMPANY

8

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11

12  VALLEY FORGE INSURANCE COMPANY,  )   Case No. 4:09-CV-02007-SBA
    A Corporation,                   )
13                                   )
                  Plaintiff,         )   **VALLEY FORGE INSURANCE**
14                                   )   **COMPANY'S OPPOSITION TO MOTION**
          vs.                        )   **FOR SUMMARY JUDGMENT AND CROSS-**
15                                   )   **MOTION FOR SUMMARY JUDGMENT**
                                     )
16  ZURICH AMERICAN INSURANCE        )
    COMPANY and DOES 1-10,           )
17                                   )   Date:    April 6, 2010
                                     )   Time:    1:00 p.m.
18                Defendants.        )   Dept.:   Ctrm 3, 3rd Floor
                                     )   Complaint Filed: 04/08/2009
19                                   )   [Trial Not Set]
                                     )
20  _____)

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page No.:

I. INTRODUCTION.................................................................................1

II. ZURICH'S GROUNDS IN SUPPORT OF ITS MOTION.........................................1

III. THE CROSS-MOTION...........................................................................3

IV. FACTS........................................................................................3

V. ISSUES.........................................................................................7

VI. ARGUMENT.....................................................................................7

    1. Under The Terms of The Indemnity Provision of The Subcontract, There Must Be, At The Very Least, Some Act or Omission in The Performance of Valley Forge's Insured's Work Under Its Subcontract Before the Indemnity Obligation is Triggered.................................................................................8

    2. Zurich Misunderstands the "Sole Negligence" Exception to The Indemnity Provision.................................................................................12

    3. Valley Forge is Entitled to Subrogate Against Zurich and its Assertion that Valley Forge Does Not Have Right to Anything in Its Subrogation Cause of Action Because the Subroger Was Not Out of Pocket is Without Merit.........................13

    4. Valley Forge Meets the Superior Equities Requirement..................................13

    5. Alternatively, Valley Forge is Entitled to Equitable Indemnity.........................14

    6. Equitable Contribution is Another Available Alternative Remedy Should the Court Decide that Subrogation and Equitable Indemnity Are Not Appropriate........14

VII. OBJECTIONS TO EVIDENCE.....................................................................15

    1. Valley Forge Objects to Zurich's Proferred Evidence of Hathaway's Lawyer's "Preliminary" Opinion That Reinhardt and Its Employee Might Be Found To Be 10 to 20% At Fault.........................................................................15

VIII. CONCLUSION..................................................................................16

-i-

VALLEY FORGE INSURANCE COMPANY'S OPPOSITION TO MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - Case No. 4:09-CV-02007-SBA

# TABLE OF AUTHORITIES

**CASES**

Page No.:

*American Cas. Co. of Reading, PA. v. General Star Indem. Co.* (2005) 125 Cal.App.4th 1510 ........ 10

*Continental Heller Corp. v. Amtech Mechanical Services, Inc.* (1997) 53 Cal.App.4th 500 ............. 11

*Crawford v. Weather Shield Mfg., Inc.* (2008) 44 Cal.4th 541 .......................................................... 11

*Edmonson Property Management v. Kwock* (2007) 156 Cal.App.4th 197 ...................................... 8, 9

*Fireman's Fund Insurance Co. v. Maryland Casualty Insurance Co.* (1998) 65 Cal.App.4th 1279 ...........................................................................................................................................................14

*Hartford Casualty Co. v. Mt. Hawley Ins. Co.* (2004) 123 Cal.App. 278 ........................................ 8, 9

*National Union Fire Ins. Co. of Pittsburgh, PA v. Landmark American Ins. Co.* L 1390591, 5 -6 (N.D.Cal.,2006) ................................................................................................................................. 10

*Rossmoor Sanitation v. Pylon, Inc.* (1975) 13 Cal.3d 622 ................................................................. 8

*St. Paul Fire and Marine Ins. Co. v. American Dynasty Surplus Lines Ins.* (2002) 101 Cal.App.4th 1038 .............................................................................................................................. 9, 10, 11

*State Farm Gen. Ins. Co. v. Wells Fargo Bank* (2006) 145 Cal.App.4th 1098 ............................ 13, 14

*Troost v. Estate of DeBoer* (1984) 155 Cal.App.3d 289 .................................................................. 13

*United Services Automobile Assn. v. Alaska Insurance Co.* (2000) 94 Cal.App.4th 638 .................. 14

**STATUTES**

California Civil Code § 2782 ...........................................................................................................12

**FEDERAL RULES**

Rule 56(a) .......................................................................................................................................1

**OTHER AUTHORITIES**

OSHA, Title 8 C.C.R. §1735(d)(4) ...................................................................................................4

46 Cal.Jur.3d § 108 .........................................................................................................................12

## I.      INTRODUCTION

Valley Forge Insurance Company (Valley Forge) opposes Zurich American Insurance Company(Zurich) Motion for Summary Judgment and hereby asserts its Cross-motion for Summary Judgment under FRCP Rule 56(a).

Valley Forge's Complaint in this matter asserts alternative causes of action for equitable subrogation, indemnity, and contribution.  The core allegations in the Complaint are that Zurich's insured, Hathaway Dinwiddie Construction Company (Hathaway), the prime contractor on a renovation project had sole control of the worksite and that Hathaway was aware of potential structural integrity problems with the roof that Valley Forge's insured, Reinhardt Roofing (Reinhardt), was working on.  Hathaway called in a structural engineer to examine the roof but did not warn or remove Reinhardt employees who were working on the roof while the engineer determined whether the roof was safe to work on.  The roof collapsed, injuring four of the Reinhardt employees.  Hathaway tendered its defense to Reinhardt's insurer, Valley Forge.  Valley Forge accepted the tender of defense under a reservation of rights because of the insurance and indemnity provisions of the Hathaway-Reinhardt subcontract and eventually settled the case on Hathaway's behalf at mediation.

Zurich refused to participate in its insured's defense or the settlement discussions when invited to do so when it had been discovered that Reinhardt had nothing to do with the accident and that Zurich's insured, in fact, was "solely" responsible for the injuries that the Reinhardt employees sustained.

## II.     ZURICH'S GROUNDS IN SUPPORT OF ITS MOTION

Zurich states its grounds at the beginning of its motion.  They are, in the order that Zurich presents them:

1.      Zurich asserts that the equitable contribution claim lacks merit because the additional insurance clause in the subcontract required Valley Forge's insurance to be primary, Valley Forge's insured was bound by the terms of the contractual indemnity agreement, and Zurich's insured was not solely negligent.

1
2
3
4
5
6
7

*The Valley Forge response is that while the subcontract does include indemnity and insurance requirements, these are not relevant because (a) the indemnity agreement was never triggered so as to impose an indemnity obligation on Valley Forge's insured and (b) the additional insured provision limited coverage to liability arising out of its insured's negligence in the performance of its work. In any event, Zurich's insured was solely negligent.*

8
9
10
11
12

2.      Zurich asserts that the equitable subrogation claim lacks merit because Hathaway has not expended any funds and that since Valley Forge "stands in the shoes" of the subrogor, there are no funds to recover. Zurich alleges that it is in an equitably superior position, preventing any subrogation claims against it.

13
14
15
16
17
18

*Valley Forge's response is that equitable subrogation does not require that Zurich's insured suffer any monetary loss. All that is required is that it paid the defense and indemnity costs on behalf of Zurich's insured, costs that Zurich had a duty to pay. Zurich is certainly in an equitably inferior position, having denied its own insured of its policy benefits.*

19
20
21
22
23
24

3.      Zurich asserts that the equitable indemnity claim lacks merit because Zurich was not primarily liable for providing its insured with a defense and indemnity because the Valley Forge policy was primary, the subcontract terms required Reinhardt's insurer to defend and indemnify its insured, and its insured was not solely negligent.

25
26
27

*Valley Forge's response is that the subcontract does include indemnity and insurance requirements but these are not relevant because (a) the indemnity agreement was never triggered so as to impose an indemnity obligation on Valley*

28

*Forge's insured and (b) the additional insured provision limited coverage to liability arising out of its insured's negligence in the performance of its work. In any event, Zurich's insured was "solely negligent."*

### III.   THE CROSS-MOTION

Valley Forge is asking the Court not only to deny Zurich's motion for summary judgment but also to grant summary judgment in Valley Forge's favor and award Valley Forge the amounts it spent to defend and indemnify Hathaway in the underlying action plus interest at the legal rate from the time of the settlement to the present. Valley Forge has pleaded alternate theories of recovery: equitable subrogation, equitable indemnity, and equitable contribution.

### IV.   FACTS

This case arises out of a construction site accident where four employees of Reinhardt Roofing were injured when a roof canopy that they were working on collapsed. Reinhardt was the roofing subcontractor for Hathaway Dinwiddie, Inc., the general contractor at the site. Valley Forge Insurance Company insured Reinhardt Roofing and made Hathaway an additional insured pursuant to the terms of the subcontract but under a reservation of rights to deny coverage if appropriate. The subcontract also included an indemnity provision that required the subcontractor to defend and indemnify the general contractor for injuries and damages that arose out of the subcontractor's acts or omissions in the course of performing its work.

The injured workers sued Hathaway and DES, the engineer/architect on the job. Hathaway and it insurer, Zurich American Insurance Company, tendered Hathaway's defense to Reinhardt and Valley Forge. ¶25 and ¶ 26, p.10. [All references are to the Stipulated Facts, item number followed by the page or pages on which the stipulated item appears.] Valley Forge accepted the tender under a reservation of rights and paid for Hathaway's defense. Hathaway insisted that it wanted their lawyers to defend them and Valley Forge agreed. As the litigation progressed it became apparent that Reinhardt had absolutely nothing to do with the cause of the accident which was a structural failure of the attachment of the canopy to the side of the building. Valley Forge attempted to get Zurich involved in the defense of its insured and to at least contribute to the settlement of the case. Zurich

1  ignored these attempts and Valley Forge settled the case on behalf of Zurich's insured, Hathaway.

2  See the Declaration of Mitchell H. Roberts, attached hereto.  Valley Forge incurred defense costs of

3  $160,617.26 and paid the underlying plaintiffs $905,000 to settle their claims against Hathaway.

4  Reinhardt was not named as a defendant in the underlying case because of the worker's

5  compensation exclusivity rule.  Neither of the named defendants in the underlying case, however,

6  filed cross-complaints against Reinhardt.  OSHA investigated Hathaway, DES, and Reinhardt's

7  involvement in the cause of the accident.  Hathaway and DES were cited with "serious" violations

8  and Reinhardt was exonerated.  OSHA determined that Hathaway was aware of the dangerous

9  condition of the property yet did nothing about it.  It issued a serious violation citing Title 8 C.C.R.

10  §1735(d)(4) regarding the demolition of buildings.  ¶22, p.9.  The OSHA citation reads in pertinent

11  part:

12  
13  
14  
15  

> The controlling, creating and exposing employer Hathaway Dinwiddie, as the work progressed detected the hazards resulting from the weakened roof deck and loosened material but failed to stop work and correct the hazard by shoring, bracing, or other effective means.  The failure to stop work and correct the hazard resulted in four employees receiving injuries, one severely, when the soffit/canopy collapsed 8-12 feet.

16  
17  Hathaway "detected the hazards" because a Reinhardt employee, a roofer, noted that there

18  appeared to be a gap between the edge of the canopy and the building.  He had worked on other

19  canopies on the job where there was no such gap.  He called this to the attention of the Hathaway

20  foreman who contacted DES to have someone assist him in evaluating the situation.  Both the

21  Hathaway foreman and the engineer were aware of the gap and were concerned that there might be a

22  structural problem.  They asked a Reinhardt employee to remove roofing material so they could have

23  a better look.  He did so.  They then went over to another canopy to see how it was attached to the

24  building.  In the meantime, they left the four Reinhardt employees on the subject canopy without

25  issuing a warning that there might be a problem with the structural integrity of the roof.  The

26  Hathaway foreman had the authority to order the men off of the roof but he failed to do so.  While the

27  foreman and the engineer were looking at the other canopy, the subject canopy collapsed, resulting in

28  

VALLEY FORGE INSURANCE COMPANY'S OPPOSITION TO MOTION FOR SUMMARY
JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT - Case No. 4:09-CV-02007-SBA

1    injuries to the four men.

2         The weight of the testimony in the underlying case shows that Hathaway failed to meet its

3    obligations concerning work site safety and was solely responsible for the accident:

4         a.    Aldolfo Ramirez (a Reinhardt employee) told Fidel Carrasco about a gap between the

5    canopy he was working on and the exterior wall of the building.  Mr. Carrasco told him to show the

6    condition to the Hathaway superintendant.  ¶28, p.12:18-28.

7         b.    Aldolfo Ramirez (one of the injured roofers) testified that on the day of the accident

8    he was removing roofing materials from the canopy that collapsed.  ¶29, p. 14:18-21.  He had

9    nothing to do with the plywood underlayment.  ¶29, p.14:23-24.  He saw a white guy and a Chinese

10   guy on the roof (Mr. Fox, the Hathaway Superintendent or foreman and Mr. Tan, the DES engineer.)

11   ¶29, p. 15:10-15.  They asked him to remove roofing material so they could see the "gap" better.

12   ¶29, p. 15:23-27.  He told Mr. Fox that there was a condition that looked different from the other

13   canopies "several days' before the accident.  ¶29, p.16:16-23.  The roof felt stable and not wobbly.

14   ¶29, p.18:4-7.

15        c.    Angel Mejia (one of the injured roofers) testified that nobody told him to stop

16   working on the canopy or to get off the canopy at any time on the day of the accident.  ¶30, p.21:13-

17   18.

18        d.    Daniel Lopez (one of the injured roofers) testified that on the day of the roof collapse

19   no one told him to get off the canopy because of a safety concern.  ¶31, p.23:5-7.

20        e.    Maximo Mejia (one of the injured roofers) testified that nobody told him the canopy

21   was unstable.  ¶32, p.23:24-25.  Prior to the collapse, no one told him to leave the work area (i.e., the

22   canopy).  ¶32, p.24:25:27.

23        f.    Mr. Tan (the DES engineer who examined the canopy) testified that he observed dry-

24   rot in the plywood substrate and that this condition did not cause any concerns regarding the

25   structural integrity of the canopy.  ¶34, pp.29:22-25, 30:6-16.  He responded to Hathaway's request

26   that he inspect the gap and the canopy because of Hathaway's concerns about the structural integrity

27   of the canopy.  ¶32, p.31:5-23.  He met with Gary Fox from Hathaway.  ¶32, p.:27-28.  He saw 3

28

workers on the canopy while inspecting it with Mr. Fox. ¶32, p.37:9-14.  He did not ask Mr. Fox to have the workers get off of the roof because he was still investigating its structural integrity. ¶32, p.43:4-11.  Mr. Fox told the workers not to stand in the same spot. ¶32. p.43:15-18.  He didn't know whether the canopy would collapse or not. ¶32: 25-27.  He did not know why he did not tell Mr. Fox to get the workers off the roof until it was determined that the canopy was safe. ¶32, 46: 1-4.  Mr. Fox told the workers not to stand in one spot as a safety precaution. ¶32, p.52:4-7.  He did not observe the workers doing anything that they were not supposed to do. ¶32, p.52:21-22.

   g.   Gary Fox (Hathaway's superintendant) testified that he did not know if there was a structural problem with the canopy so he called in an engineer.  If there was a problem, it would pose a safety problem for the men working on the canopy. ¶36, p.59:5-15.  The workers were not told to get off of the roof. ¶36, p.59:16-20.  It is possible that he told Reinhardt's supervisor to keep the men from working near the gap. ¶36, p.60:7-12.  He was not certain that he told the Reinhardt supervisor to redirect his men. ¶36, p.61:15-17.  There were Reinhardt employees on the roof on the day of the accident and he told them to move to the southwest corner of the roof. ¶36, p. 63:20-24.  He did not have a problem with allowing the men to work on the canopy on the day of the accident while he and Mr. Tan were investigating whether there was a structural problem with the canopy.  Mr. Tan had not told him there was no problem. ¶36, p. 65:3-25.  He did not consider pulling the workers off the roof until the there was a final answer regarding its safety. ¶36, p.66:2-5.  He had the authority to do so but did not. ¶36, p.66:12-14; 73:27-74:3.  It "could possibly be prudent" for him to have the workers off the canopy until it was determined to be safe to work on. ¶ 36, p.67:26 – 68:2. Hathaway had control over the subcontractors and had a duty to make sure the work area is safe before a subcontractor goes to work. ¶36, p.68:10-20.  The roofing crew had followed his instructions. ¶74:22-27.

   He had never seen Union roofers such as the ones here work on a plywood roof deck. ¶36, p.71:17-21.  The rotten panels that needed replacement were not located on the canopy that collapsed. ¶36. p.72:6-11.

## V.   ISSUES

1.   We are in agreement that this is a "Type 1" indemnity agreement.  Zurich appears to argue that all agreements that fall into this category are the same.  They are not.  The indemnity agreement here is not triggered unless the indemnitee can point to some "act or omission" on the part of the indemnitor.  Here, the only connection between the canopy failure and Reinhardt was that four of its employees were injured because of a hazard over which neither they nor their employer had any control.

2.   Zurich ignores that indemnity agreement must be triggered before it comes into play and concentrates rather mechanically on the "sole negligence" exception.  That is, it assumes that it was, in fact, triggered in the first place.  Zurich also appears to assert that because some entity not a party to the subcontract is negligent as well as the indemnitee, the indemnitee is not "solely" negligent as that term is used in cases where the indemnitor has no connection to the accident but where there are multiple responsible parties in addition to the indemnitee.  Valley Forge disputes this.

3.   Valley Forge has pleaded a right to subrogation, indemnity, or contribution.  Valley Forge believes that it is entitled to full reimbursement of the sums it paid to defend and indemnify Zurich's insured under the doctrines of subrogation or indemnity or, in the alternate, that it is entitled to substantial contribution.

## VI.   ARGUMENT

Zurich correctly points out in its Motion for Summary Judgment that the interpretation of contract terms is properly decided by the court.  It also correctly states that in the absence of a evidence to support a genuine issue for trial, the motion should be granted, citing the *Celotex* case.  Because Zurich is unable to point to any act or omission related to the performance of Valley Forge's insured that was in any way connected to the cause of the underlying accident, summary judgment in Valley Forge's favor is appropriate.

1. **Under The Terms of The Indemnity Provision of The Subcontract, There Must Be, At The Very Least, Some Act or Omission in The Performance of Valley Forge's Insured's Work Under Its Subcontract Before the Indemnity Obligation is Triggered.**

Zurich relies primarily on two cases: *Hartford Casualty Co. v. Mt. Hawley Ins. Co.* (2004) 123 Cal.App. 278, and *Edmonson Property Management v. Kwock* (2007) 156 Cal.App.4th 197. In the *Hartford* case, the subcontractor's insurer was seeking contribution from the general contractor's insurer. Both parties admitted some degree of negligence and the subcontractor's insurer wanted to be reimbursed for the prime contractors' share. The indemnity agreement there, as here, precluded the action against the prime contractor's insurer because the only exception to the agreement was where the prime or general contractor was solely negligent. There was no possibility of such a finding since the subcontractor admitted that it was partly at fault. It follows that under these circumstances, the prime contractor could not be found to be solely negligent. The *Hartford* case relied heavily on *Rossmoor Sanitation v. Pylon, Inc.* (1975) 13 Cal.3d 622. In the *Rossmoor* case, where the contractor sought contribution from the owner, the court enforced the indemnity agreement despite conflicting language in the "other insurance" provisions of the two policies. Both cases had "Type I" indemnity clauses. Both cases stand for the proposition that construction contract indemnity provisions trump "other insurance," additional insured, or any other limiting language in the respective parties' insurance policies. That is, the insurers are to be held to same indemnity restrictions as their insureds under the terms of the indemnity clause. They do not stand for the proposition that a subcontractor indemnitor under a "Type I" indemnity clause is an indemnitor for the entire project as Zurich, in effect, argues here.

*Edmonson Property Management v. Kwock* (2007) 156 Cal.App.4th 197 is discussed at length in Zurich's argument, presumably to show that there is a distinction between "Type I" and "Type II" indemnity agreements. Valley Forge has no quarrel with this. The thrust of Valley Forge's position is that the indemnity agreement here was never triggered regardless of whether it was "Type I" or "Type II."

1   The discussion over "other insurance" clauses is also irrelevant to the motions before the

2 court.  Nowhere does Zurich argue or present evidence that Hathaway even qualifies as an additional

3 insured because of either the indemnity or insurance provisions of the subcontract, or the terms of the

4 additional insurance coverage that Valley Forge provided.  In fact, the additional insured

5 endorsement here clearly states that the person or organization that claims additional insured status is

6 only an additional insured "for liability due to [the named insured's/Reinhardt's] negligence

7 specifically resulting from 'your work' for the additional insured which is the subject of the written

8 contract or written agreement."  See ¶16 at pp 7-8, particularly part B of the quoted endorsement on

9 page 8.  There is no credible evidence that Reinhardt was in any way negligent or that its negligence,

10 if any, contributed to the accident.  Consequently, all of the discussion regarding "other insurance"

11 clauses is of no moment and should be ignored.  Since Hathaway was not an additional insured, the

12 "other insurance" provision in the additional insured endorsement is irrelevant.

13   The California reported case that exactly on point with this case is *St. Paul Fire and Marine*

14 *Ins. Co. v. American Dynasty Surplus Lines Ins.* (2002) 101 Cal.App.4th 1038.  In that case an

15 electrician was injured when a pipe burst while he was performing subcontract work nearby.  It was

16 uncontested that the bursting of the pipe was the fault of the general contractor and was unconnected

17 to the electrical subcontractor's work.  The "Type I" indemnity agreement there, like the one here,

18 provided for the indemnification of the general contractor.  It provided that the subcontractor would

19 indemnify the general for claims "*arising out of or resulting from the performance of the Work ...*"

20 (Emphasis in the original.)  *St. Paul Fire and Marine Ins. Co.* at page 1044.  As here, it required that

21 the claim "*arises from or is alleged to have arisen in whole or in part by any act or omission of*

22 *Subcontractor . . . .*" (Emphasis in the original.)  *Id.*  The general contractor/indemnitee's insurer

23 argued there, as Zurich argues here, that since the subcontractor's employee was present on the

24 worksite and was performing work when the accident happened, the indemnity agreement was

25 triggered.  The court rejected this overly broad interpretation of the agreement and said:

26     The undisputed facts demonstrate that no "act or omission" of Sasco caused the

27     injury to its employee, but rather such injury resulted entirely from activities of

28

ARB that were *unrelated* to the work called for in the subcontract executed between Sasco and ARB. The "mere presence" on the jobsite of a Sasco employee is not sufficient to constitute an act or omission on Sasco's part. In such circumstances, the "liability" of ARB, covered by the additional insured endorsement in the policy issued by American Dynasty, did not arise from Sasco's "ongoing operations." As a result, we conclude that (1) Sasco's promise of contractual indemnity did not embrace the liability claim for which ARB and St. Paul sought indemnity, and (2) there was no potential for coverage under the American Dynasty policy for the injured employee's claim against ARB. We therefore reverse both the judgment and the postjudgment order. *St. Paul Fire and Marine Ins. Co.*, pages 1042 -1043.

The court explained that the line of cases that give broad scope to the "Type I" indemnity agreement simply do not apply where we have this kind of limiting language:

There are at least two reasons why neither *Fireman's Fund* nor *Syufy* is helpful to ARB's argument. First, there is a significant factual distinction. In both of these cases, the subcontractor's employee was injured while performing some act directly related to the work called for by the subcontract. In other words, the employee was engaged in the activity called for under the subcontract or necessarily related thereto and it was the *performance* of *that activity* that led to the injury. More was involved than the employee's mere incidental presence in a "zone of danger" that had been created entirely by the actions of the general contractor and had *nothing* to do with the work called for in the subcontract. In *Fireman's Fund*, the employee was injured because of the failure of a step utilized by the employee while actually engaged in the work called for by the subcontract. In *Syufy*, the employee sustained his injury while exiting the jobsite through the only exit available to him.

Second, ARB's argument fails to come to terms with the stipulated fact that the language of the Subcontract contains an *express proviso* not contained in the additional insured endorsements in either *Fireman's Fund* or *Syufy* (or, for that matter, any of the other cases cited by ARB). Sasco expressly undertook no duty to indemnify ARB except for a liability that arose from an "act or omission" by Sasco *during the performance of the work called for by the Subcontract*. Such language can have no other meaning or purpose than to limit the scope of Sasco's indemnity to injuries occurring in circumstances over which it has at least *some* control and where it is engaged in activity that is causally related in some manner to the injury for which indemnity is claimed. As we have already emphasized, that precondition clearly did *not* occur here.

The *St. Paul Fire and Marine* case has been cited with approval and explained in *American Cas. Co. of Reading, PA. v. General Star Indem. Co.* (2005) 125 Cal.App.4th 1510, 1528-1529; and *National Union Fire Ins. Co. of Pittsburgh, PA v. Landmark American Ins. Co. L* 1390591, 5 -6

(N.D.Cal.,2006).  As noted in the stipulated facts and Zurich's motion here, the indemnity provision in the subcontract between Hathaway and Reinhardt stated, as did the provision in the *St. Paul Fire and Marine* case, that it is limited to losses arising out of the subcontractor's acts or omissions in the performance of its work.  See Stipulated Facts ¶11 at pp. 4-5. (Please note that there is no issue concerning willful acts on the part of Reinhardt.)

The most that Zurich can about this indemnity clause is that it is ambiguous.  The "sole negligence" exception and the provision that the indemnitee's concurrent negligence will not abrogate the duty to indemnify suggest that that there must be some negligence on the indemnitor's part before the duty to indemnify arises.  This is inconsistent with other language in the provision that says that the subcontractor will indemnify the prime or general contractor for any liabilities that arise out of the acts or omissions of the subcontractor in the performance of its work.  If, in fact, the court finds that the provision is ambiguous, any ambiguity in the indemnity provision it must be resolved in favor of the indemnitor that is in the far weaker bargaining position.  Such clauses "must be particularly clear and explicit, and will be construed strictly against the indemnitee. [Citations Omitted.]" *Crawford v. Weather Shield Mfg., Inc.* (2008) 44 Cal.4th 541, 552.  While we believe that the language of this indemnity agreement is clear, should an ambiguity be found, it must be resolved in favor of the weaker bargaining party, Reinhardt.

In any event, the law is clear that contrary to Zurich's position, this type of indemnity agreement does not impose "virtually unlimited liability" on Valley Forge's named insured as Zurich asserts here.  There must be some causal connection between the accident and the "performance of the subcontract, not merely to the performance itself." *Continental Heller Corp. v. Amtech Mechanical Services, Inc.* (1997) 53 Cal.App.4th 500, 507.  That is, it is not enough to say that since the accident occurred while the subcontractor was performing its work, the indemnity provision is triggered.  There must be some link between the performance of the work and the cause of the accident before the indemnity provision comes into play.

The testimony in the underlying case shows that Hathaway maintained control of the work site and that it had a duty to make sure that the work areas were safe for the workers before allowing

them to work on the site. Hathaway failed miserably in this regard and now argues in this court that the accident somehow arose out of the acts or omissions of the victims. These men were simply doing their job when the accident occurred and were injured only because Hathaway allowed them to work in an area it suspected was unsafe, and was, in fact, unsafe.

**2.   Zurich Misunderstands the "Sole Negligence" Exception to The Indemnity Provision.**

Zurich asserts that the OSHA reports support a finding of that DES and Hathaway were jointly negligent and Zurich concludes that because Hathaway's consultant was found to be in serious violation of safety rules, just as Hathaway was, Hathaway was not "solely" negligent as envisioned in the indemnity provision. This is both factually and legally incorrect. The fact is that Hathaway contacted DES to assist it in evaluating the structural integrity of the canopy. The fact that DES contracted separately with the owner is of no consequence. As the general contractor, Hathaway had a nondelegable duty to provide a safe work place and if it chose to use a consultant to assist, the consequences of that consultant's acts are still the general's responsibility. See 46 Cal.Jur.3d § 108, *et seq.*

It is undisputed that the OSHA report concerning Hathaway states that it had total control of the work site. Hathaway's superintendent, Mr. Fox so testified and OSHA found that Hathaway was negligent as the "controlling, creating and exposing employer." The statute prohibiting indemnification for the indemnitee's sole negligence and the cases considering the matter of sole negligence seem to presuppose that the issue is strictly between the parties to the subcontract, the subcontractor and the contractor. A contractor's liability includes the liability of its subcontractors, agents, and independent contractors directly responsible to it. See Civil Code § 2782. It is simply unreasonable to construe "sole negligence" in this context so the general would be absolved of its consequences if its negligence if it can show that some person or entity not a party to the subcontract but working as its agent or consultant shared some degree of negligence with it. "Sole negligence" here can only mean the negligence of the contractor vis-à-vis the other party to the subcontract who was Valley Forge's insured, Reinhardt, and the negligence of Hathaway's agents and consultants

does not in any way affect the "sole negligence" exception to the indemnity agreement. The prime or general contractor cannot wash its hands and declare that it is not "solely negligent" because its agent or consultant was also negligent regarding work site safety.

**3.**     **Valley Forge is Entitled to Subrogate Against Zurich and its Assertion that Valley Forge Does Not Have Right to Anything in Its Subrogation Cause of Action Because the Subroger Was Not Out of Pocket is Without Merit**

A right to subrogation arises as a matter of law and equity upon a payment of a judgment or settlement on behalf of the subroger. It is the appropriate remedy for an insurer that has paid defense costs and fees and indemnity amounts to get reimbursement from the insurer that had the duty to provide the defense and indemnify its insured. Valley Forge agrees with Zurich that the right to subrogation is derivative and that the subrogated insurer stands in the shoes of the subrogor. This fact does not support Hathaway's novel objection that since the subrogee here has no out of pocket expenses because Valley Forge paid for its defense and indemnity, Valley Forge's subrogation claim has no value. The law is that Valley Forge is entitled to recover by way of subrogation all of the amounts that it paid on behalf of Zurich's insured. There is no requirement that the subrogor be out of pocket. *Troost v. Estate of DeBoer* (1984) 155 Cal.App.3d 289, 295.

**4.**     **Valley Forge Meets the Superior Equities Requirement.**

Zurich also claims that the subrogation cause of action is flawed because of the superior equities doctrine which is explained in *State Farm Gen. Ins. Co. v. Wells Fargo Bank* (2006) 145 Cal.App.4th 1098, at page 1108. Applying the doctrine here, there is no question about Valley Forge's equities being superior to Zurich's. Valley Forge accepted Zurich's insured's defense in good faith under a reservation of rights and continued to defend it and also indemnified it despite the fact that it had become apparent that Zurich's insured had no indemnity or additional insured rights. Zurich, on the other hand, refused to respond to requests that it step into its insured's defense and

wrongfully declined to participate in the settlement on behalf of its insured. ¶39, p.77; *State Farm Gen. Ins. Co. v. Wells Fargo Bank, supra,* p. 1112, *et seq.*

### 5. **Alternatively, Valley Forge is Entitled to Equitable Indemnity.**

As noted in Zurich's motion papers, equitable indemnity shifts the entire loss to the party who should have paid a debt that the equitable indemnitee paid instead. It is an appropriate remedy where "one party pays a debt for which another is liable and which in equity and good conscience should have been paid by the other party." *United Services Automobile Assn. v. Alaska Insurance Co.* (2000) 94 Cal.App.4th 638, 633-645. As explained above, during the course of the underlying litigation it became apparent that Valley Forge's insured had no duty to indemnify Zurich's insured nor did it qualify as an additional insured. At that point, Zurich should have stepped in, taken over the defense and indemnified its insured. It did not do this, preferring to ignore the circumstances that came to light. In order to protect Zurich's insured, Valley Forge continued to defend and also settled the case on behalf of Zurich's insured. There is no doubt that Valley Forge is entitled to equitable indemnity for paying "a debt for which [Zurich] is liable and which in equity and good conscience should have been paid by [Zurich]."

### 6. **Equitable Contribution is Another Available Alternative Remedy Should the Court Decide that Subrogation and Equitable Indemnity Are Not Appropriate**

Equitable contribution is a remedy that allows an insurer that has paid more than its equitable share to defend and indemnify an insured to recover from other insurers on the risk the amounts that they should have paid. *Fireman's Fund Insurance Co. v. Maryland Casualty Insurance Co.* (1998) 65 Cal.App.4th 1279, 1293. The purpose is to accomplish substantial justice by equitably allocating the burden of the costs of defending and indemnifying the insured among the insurers that were on the risk. *Fireman's Fund Insurance Co. v. Maryland Casualty Insurance Co., supra,* at 1293.

Again, once it became apparent that Zurich's insured was not entitled to either contractual indemnity or to additional insured status, Zurich should have, at the very least, agreed to share in the costs of defending and indemnifying its named insured. Instead, it chose to do nothing.

## VII.   OBJECTIONS TO EVIDENCE

### 1.   Valley Forge Objects to Zurich's Proffered Evidence of Hathaway's Lawyer's "Preliminary" Opinion That Reinhardt and Its Employee Might Be Found To Be 10 to 20% At Fault.

Zurich relies heavily on a letter (See ¶37) wherein Hathaway's attorney apportions some negligence to both DES and Reinhardt. While we have stipulated to the letter's existence, we strongly object to its admissibility. It should be kept in mind that the defense lawyer who wrote the letter was Hathaway's lawyer, not panel defense counsel. He obviously was vigorously representing his client and was looking for ways to possibly spread the loss around as much as he could. Based on a very questionable statement that the Hathaway foreman made in the beginning of his deposition and which he later disowned to the effect that it was possible that he instructed the roofers to get off the roof pending investigation, he assigned 10-20% fault on Reinhardt. This misrepresented the foreman's full testimony (as excerpted above) and counsel's preliminary estimate that a trier of fact could possibly assign some liability to Reinhardt, therefore, is of no evidentiary value in this proceeding. Why this "guesstimate" was necessary in the first place is unclear unless counsel was trying to argue for some comparative negligence on the part of the plaintiffs. After all, Reinhardt was not a party to the underlying lawsuit and would not contribute in any case. Counsel goes on to apportion liability between DES and Hathaway and assigns 50 to 70% to Hathaway and 30 to 50% to DES.

The letter is hearsay and may not be admitted to prove the truth of the matters stated. Mr. Lynch is available as a witness and could be deposed or produced so as to provide the best evidence. As noted above, this content of the letter is unreliable and "preliminary" in nature. It cannot be considered evidence of any fault on Reinhardt's part. The letter is irrelevant and if it is proffered as expert testimony, it lacks foundation. Hathaway's trial counsel's advocacy for his client is not a

1  factual determination.  The admission of this letter into evidence is prejudicial and has no probative

2  value whatsoever.

3      It is disturbing that Hathaway has submitted this letter at all.  It certainly is not competent

4  evidence, is fatally tainted because of the declarant's obvious bias, and is contrary to the weight of

5  the evidence as presented in the stipulated facts.  The foreman in question, Mr. Fox, testified later on

6  in his deposition that he did not instruct anyone to get off the roof pending investigation of its

7  structural integrity.  The fact that he did not warn the workers or tell them to get off the roof pending

8  the investigation is corroborated not only by the plaintiffs in the underlying case but also the DES

9  engineer on the site.  Counsel's reliance on this to try to establish some negligence on the part of

10  Reinhardt can only be characterized as far-fetched and improper.

11      ## VIII.   CONCLUSION

12      Valley Forge contends and has proven that the accident here did not arise out of, nor was it in

13  any way related to any act or omission on Reinhardt's part in the course of performing its work.

14  There is simply no causal connection between what the roofers were doing and the collapse of the

15  canopy that caused their injuries.  Even if there were, the sole negligence exception to the indemnity

16  agreement applies here because of Zurich's insured's total and complete control of the work site and

17  its duty to make sure the site is safe for the subcontractor's workers.  It is solely negligent even if

18  there was a serious violation cited that OSHA found not only for it but also for its agent or

19  consultant.

20      The only real question concerns the remedy that is most appropriate under the circumstances.

21  This is a "recovery" action and any of the equitable remedies asserted are justified and appropriate.

22  The subrogation and equitable indemnity remedies would provide Valley Forge with a full recovery

23  of all of the amounts it paid to defend and indemnify Zurich's insured plus legal interest from the

24  date of the settlement of the underlying case, February 7, 2008.  Valley Forge paid $905,000 to settle

25  the underlying case on behalf of Zurich's insured and spent $160,617.26 defending Zurich's insured.

26  See ¶38 and ¶39, on pages 76 and 77 of the stipulated facts.  The Contribution remedy would provide

27  a partial recovery based on the relative responsibilities of the parties.  This is a question of equity and

28

there is no set formula.  The court has wide discretion to fashion an equitable remedy.  Even this remedy would require a finding of 100% due to Valley Forge.

Valley Forge, therefore, respectfully requests that the court deny Zurich's motion for summary judgment. grant Valley Forge summary judgment and award it the sum of $905,000 for its indemnity payment, $160,617.26 for the costs of defending Zurich's insured, and 7% simple interest from February 7, 2008 to the date of the court's order.

Respectfully submitted,

DATED:  March 16, 2010

COLLIAU ELENIUS MURPHY CARLUCCIO
KEENER & MORROW

By: _____

WILLIAM D. PAOLI
Attorneys for Plaintiff
VALLEY FORGE INSURANCE COMPANY

# PROOF OF SERVICE

I am a citizen of the United States, over the age of eighteen years, and not a party to the within action; my business address is Colliau Elenius Murphy Carluccio Keener & Morrow, Suite 600, 405 Howard Street, San Francisco, CA 94105.

On March 16, 2010, I served the foregoing document described as:

**VALLEY FORGE INSURANCE COMPANY'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT**

on the attorney(s) of record and/or interested parties in the case entitled <u>Valley Forge Ins. Co. v. Zurich American Ins. Co.</u>, U.S.D.C., Northern District of California, Case No.: 4:09-CV-02007 SBA as follows:

Jonathan Gross, Esq.                          Attorneys for Defendant,
Colin Adkins, Esq.                            ZURICH AMERICAN INSURANCE
BISHOP BARRY DRATH                            COMPANY
2000 Powell Street, Suite 1425
Emeryville, CA   94608
Tel:  (510) 596-0888
Fax: (510) 596-0899

The document(s) were served by the following means:

☐   **By PERSONAL SERVICE.**  I personally delivered the documents to the persons at the addresses listed above.  (1) For a party represented by an attorney, delivery was made to the attorney or at the attorney's office by leaving the document in an envelope or package clearly labeled to identify the attorney being served with a receptionist or an individual in charge of the office. (2) For a party, delivery was made to the party or by leaving the documents at the party's residence with some person not less than 18 years of age between the hours of 8:00 a.m. and 6:00 p.m.

☐   **By UNITED STATES MAIL.**  I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses listed above; and (1) deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid; or (2) placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business practice for collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

☐ **By OVERNIGHT DELIVERY**. I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses listed above. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

☐ **By MESSENGER SERVICE.** I served the documents by placing them in an envelope or package addressed to the person at the address listed above and providing them to a professional messenger service for service. *(A declaration by the messenger must accompany this Proof of Service or be contained in the Declaration of Messenger below).*

☐ **By FAX TRANSMISSION.** Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed above. No errors were reported by the fax machine that I used.

☒ **By ELECTRONIC TRANSMISSION.** I electronically transmitted the attached documents to the Clerk of the Court using the ECF System for filing. Based on the records currently on file, the Clerk of the Court will transmit a Notice of Electronic Filing to the ECF registrants.

    I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at San Francisco, California.

    Executed on March 16, 2010, at San Francisco, California. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_____
PAULA WOOLERY

---

PROOF OF SERVICE - 2