UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| VALLEY FORGE INSURANCE CO., | Case No:  C 09-02007 SBA |
| Plaintiff, | |
| vs. | **ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT** |
| ZURICH AMERICAN INSURANCE CO., | [Docket Nos. 31, 42] |
| Defendant. | |

Presently before the Court are Defendant's Motion for Summary Judgment and Plaintiff's Cross-Motion for Summary Judgment.  (Docket Nos. 31, 42.)  Having read and considered the papers filed in connection with these matters, and having considered the arguments made by counsel at the April 6, 2010 hearing, and being fully informed, the Court hereby DENIES Defendant's Motion for Summary Judgment and DENIES Plaintiff's Cross-Motion for Summary Judgment for the reasons set forth below.

I.      **BACKGROUND**

A.      **THE PARTIES**

The present action arises out of an underlying personal injury case, which itself arose out of a construction site accident that injured four workers on October 11, 2005.  (Stipulated Facts ("SF"), ¶ 1.)[1]  The project was owned by Slough Estates USA, Inc. ("Slough"), located in Redwood City, California.  (Id., ¶ 2.)  Slough contracted directly with an architect and engineer, DES Architects + Engineers ("DES"), whose primary on-site engineer was Swee Yong-Tan ("Tan").  (Id., ¶ 3.)  Slough also contracted directly with a general contractor,

_____

[1] Stipulated facts were jointly submitted by the parties for purposes of filing cross-motions for summary judgment.  (Docket No. 33.)  The stipulated facts were later supplemented ("SF2").  (Docket No. 54.)  The parties stipulate that, with regard to letters and depositions, true and correct copies are before the Court.

1  Hathaway Dinwiddie Construction Company ("Hathaway"), whose on-site daily

2  superintendent was Gary Fox ("Fox").  (Id., ¶ 4.)  Hathaway was insured by Zurich American

3  Insurance ("Defendant").  (Id., ¶ 5.)

4         Hathaway contracted directly with a roofing subcontractor, Reinhardt Roofing, Inc.

5  ("Reinhardt").  (Id., ¶¶ 6, 8.)  Reinhardt had two supervisors: Adolfo Ramirez ("Ramirez") for

6  the canopy roof; and Fidel Carrasco ("Carrasco") for the main roof.  (Id., ¶ 6.)  Reinhardt was

7  insured by Valley Forge Insurance ("Plaintiff").  (Id., ¶ 7.)  In compliance with the subcontract

8  agreement ("Subcontract"), Hathaway was named as an additional insured in Reinhardt's

9  insurance policy with Plaintiff.  (Id., ¶¶ 8, 9; Ex. E.)

10     **B.     EVENTS LEADING TO THE ACCIDENT**

11        On October 11, 2005, a canopy roof collapsed at the construction site, injuring four

12  Reinhardt employees engaged in removing the roofing membrane.  (Id., ¶ 20.)  Several days

13  before the accident, the canopy foreman employed by Reinhardt, Ramirez, noticed a gap along

14  the edge of the canopy, and informed his supervisor, Carrasco.  (Id. at 16:6-8; 13:19-28.)  At

15  Carrasco's instruction, Ramirez told Fox, the Hathaway superintendent, to "have a look" at the

16  gap because it "looked different" than other canopies at the site.  (Id. at 13:19-28; 16:7-23.)

17        The day before the accident, on October 10, 2005, the DES engineer, Tan, had inspected

18  the plywood substrate of the lower roof canopy.  (Id. at 29:2-16.)  The inspection was requested

19  by DES, and was unrelated to the gap.  (Id.)  Tan determined that 95% of the plywood was

20  damaged due to dry rot and appeared to be "easily breakable."  (Id. at 26:21-28; Ex. S.)  Tan

21  was concerned that someone standing on the plywood could fall through.  (Id. at 28:1-7.)

22  However at that time, Tan was not concerned about the roof's structural integrity because the

23  plywood was merely a substrate, "not a structure of the framing." (Id. at 30:6-20.)

24        On October 11, 2005, at about 9:30 a.m., Hathaway summoned Tan to inspect the gap

25  in the canopy roof, assess its structural integrity, and determine whether there was an imminent

26  danger of collapse.  (Id. at 30:22-32:5.)  Tan arrived at about 11:00 a.m.  (Id. at 32:24-28.)  At

27  11:05 a.m., Fox and Tan inspected the canopy gap from the main roof, at a distance of about

28  eight feet, but did not go down to the canopy.  (Id. at 34:2-35:8.)  At that time, they did not

observe workers on the roof.  (<u>Id.</u> at 34:10-18.)  Tan then asked to be shown another canopy for comparison.  (<u>Id.</u> at 34:7-9.)

After observing another canopy on the north side of the building, Fox and Tan returned to the canopy with the gap, and then observed Reinhardt employees on the gapped canopy roof. (<u>Id.</u> at 37:9-38:1.)  The parties acknowledge that either Fox and/or Tan directed Reinhardt workers to "probe" (according to Tan) or "expose" (according to Fox) the gap to determine its dimensions.  (<u>Id.</u> at 38:2-28, 64:14-65:14; Def.'s Mot. at 3:25-4:1; Pl.'s Mot. at 4:21-23.)  Tan then determined, at about 11:20 a.m., that the gap ran about forty-one feet between the canopy and the building.  (SF at 39:2-5, 48:1-28.)

Fox and Tan again left for the north side of the building at about 11:25 a.m., leaving the Reinhardt workers on the canopy roof.  (<u>Id.</u> at 37:24-28, 48:1-28.)  In his deposition, Tan estimates that it would have taken "a couple of hours" to complete his inspection and determine the adequacy of the canopy's attachment to the building.  (<u>Id.</u> at 48:24-49:18.)  However, the canopy roof collapsed at or before 11:45 a.m.  (<u>Id.</u> at 37:24-28; Ex. G at 5.)

When asked why he did not suggest that the Reinhardt workers be removed from the canopy, Tan answered, "I don't know."  (<u>Id.</u> at 46:1-4.)  Both Tan and Fox testified that, prior to the collapse, they discussed shoring the canopy (i.e., supporting the roof from below).  (<u>Id.</u> at 40:4-42:28, 74:12-14.)  Fox also directed the Reinhardt workers to spread out across the canopy.  (<u>Id.</u> at 51:22-52:18.)  Fox acknowledged that he had authority to remove the workers from the canopy.  (<u>Id.</u> at 66:9-12.)  Fox also acknowledged that he had a duty to ensure the safety of the work area.  (<u>Id.</u> at 68:16-21.)  When asked if he considered removing workers from the canopy, Fox stated, "no," explaining that he was waiting for Tan to affirmatively indicate that the roof was unsafe.  (<u>Id.</u> at 66:3-9.)

## C. CAL-OSHA CITATIONS

The California Division of Occupational Safety and Health ("Cal-OSHA") investigated DES, Hathaway, and Reinhardt in connection with the October 11, 2005 collapse.  (<u>Id.</u>, ¶ 21; Exs. G, H, I.)  Cal-OSHA cited Hathaway and DES for "serious violations."  (<u>Id.</u>, ¶¶ 22, 23.) The citation against Hathaway states, in part:

1
2
3
4

> The controlling, creating, correcting and exposing employer Hathaway
> Dinwiddie, as the work progressed detected the hazards resulting from the
> weakened roof deck and loosened material but failed to stop work and correct
> the hazard by shoring, bracing, or other effective means.  The failure to stop
> work and correct the hazard resulted in four employees receiving injuries, one
> seriously when the soffit/canopy collapsed 8-12 feet.

5

(Id., Ex. G at 5.)  The citation against DES charges the same failures, but describes DES's role

6

slightly differently: "[t]he controlling, creating and correcting employer [DES], detected flaws

7

in metal frame soffit/canopies and recognized hazards as the work progressed resulting from

8

the weakened roof deck and loosened material…." (Id., Ex. H at 1.)

9

The Cal-OSHA investigation exonerated Reinhardt.  (SF, ¶ 24.)  The report issued to

10

Reinhardt states, in part:

11
12
13

> It has been determined that no standard, rule, order or regulation set forth in Title
> 8, California Code of Regulations, and Division 5 of the California Labor Code,
> has been violated in connection with the above described industrial accident
> and/or occupational illness.

14

(Id., Ex. H at 4.)

15

### D.   THE UNDERLYING PERSONAL INJURY ACTION

16

On December 5, 2006, a complaint for negligence and premises liability was filed in

17

state court by the injured workers in the underlying action Ramirez v. Hathaway Dinwiddie,

18

Case No. CDC-06-458439 ("Ramirez Action").  (SF, ¶ 25.)  Both Hathaway and DES were

19

named as defendants.  (Id.)  Reinhardt was not named as a defendant because of the exclusive

20

remedy of worker's compensation.  Furthermore, neither of the named defendants in the

21

Ramirez Action filed a cross-complaint against Reinhardt.

22

Plaintiff accepted the defense of Hathaway under a full reservation of rights.  (Id., ¶ 26.)

23

Plaintiff later attempted to involve Defendant in Hathaway's defense, but Defendant refused to

24

participate.  On February 7, 2008, the Ramirez Action settled at mediation for $1,155,000:

25

DES paid $250,000, and Plaintiff paid $905,000 on behalf of Hathaway.  (Id., ¶ 38.)  Plaintiff

26

asserts that it also incurred $160,617.26 in defense costs.  (Pl.'s Mot. at 4:2-3.)

27

28

**E.**     **RELEVANT PROVISIONS OF THE SUBCONTRACT AGREEMENT AND THE INSURANCE POLICIES**

Prior to the accident, on September 9, 2005, Hathaway and Reinhardt entered into the Subcontract Agreement ("Subcontract").  (SF, ¶ 8.)  On September 1, 2005, prior to the execution of the Subcontract, Hathaway sent several documents to Reinhardt explaining the insurance requirements for the project.  (Id., ¶ 12.)

Article 5.1 of the Subcontract requires that Reinhardt obtain insurance naming Hathaway as an additional insured.  (Id., Ex. C at 49.)  It states that the subcontractor insurance coverage "shall include liability for all injuries and damages referred to in Article 6, 'Indemnity'."  (Id.)  The policy "shall be primary" to Hathaway's coverage with Defendant, and waive "the rights of subrogation."  (Id. at 55.)  The policy shall be obtained "by use of Insurance Services Form CG 20 10 11 85 or its equivalent."  (Id.)  Prior to the commencement of work, the subcontractor is required to furnish the contractor with certificates verifying that such insurance has been obtained.  (Id. at 49.)

The Subcontract also contains an indemnity provision in Article 6, stating, in pertinent part:

> 6.1  Subcontractor shall indemnify and save harmless Contractor and Owner . . . of and from any and all claims, demands, causes of action in law or in equity . . . of liabilities, of every kind and nature whatsoever <u>arising out of or in any way connected with or incidental to, the performance of the Work under this Subcontract</u> or any of the obligations contained in this Subcontract ("Claims"). <u>The obligations under this Article 6 shall apply to any acts or omissions, willful misconduct or negligent conduct, whether active or passive, on the part of the Subcontractor, [its agents and employees].</u>
> …
>
> 6.2  The Subcontractor agrees, at its own cost, expense and risk to defend the indemnities against any Claims as defined in this Article that may be brought or instituted by third persons, including, but not limited to, government agencies or employees of Subcontractor.
> …
>
> 6.3  It is expressly acknowledged and agreed that each of the foregoing indemnities is independent, that each shall be given effect, and that each shall apply despite any acts and omissions, misconduct or negligent conduct, whether active or passive, on the part of the Contractor, Owner, or other indemnitee;

except that the duty to indemnify or hold harmless a particular indemnitee shall
not be applicable to damages for death or bodily injury to persons, injury to
property, or any other loss, damage, or expense arising from the sole negligence
or willful misconduct of such particular indemnitee, its agents, servants, or
independent contractors who are directly responsible to such particular
indemnitee, excluding Subcontractor herein.

(Id. at 50) (emphasis added).

On September 6, 2005, Plaintiff issued Reinhardt a certificate of insurance naming
Hathaway as an additional insured.  (SF, ¶ 15.)  The policy contains an "Other Insurance"
clause that states in part, "[t]his insurance is excess over any other insurance naming the
additional insured as an insured whether primary, excess, contingent or on any other basis
unless a written contract or written agreement specifically requires that this insurance be either
primary or primary and noncontributing to the additional insured's own coverage."  (Id., Ex. E
at 17) (emphasis added).

The policy issued by Plaintiff to Reinhardt did not use form CG 20 10 11 85 ("Form
CG"), but instead used form G-140331-A99 ("Form A99").  (Id., ¶ 16.)  Form A-99 covers
Hathaway (the additional insured) "solely for liability due to [Reinhardt's] negligence
specifically resulting from '[Reinhardt's] work' for the additional insured which is the subject
of the written contract or written agreement."  (Id., ¶ 16; 7:14-8:18.) [2]  Moreover, Plaintiff's
policy has general liability limit of $1 million.  (Id., ¶ 7.)  Prior to the commencement of work,
the certificate, including Form A-99, was submitted to Hathaway.  (Id., ¶ 18.)  Hathaway did
not object to the use of Form A-99.  (Id., ¶ 19.)

Defendant's policy to Hathaway as the named insured contains an "Other Insurance"
clause that states:

If other valid and collectible insurance is available to the insured for a
loss we cover … our obligations are limited as follows:

a.    Primary Insurance

---

[2] Form CG would have provided broader coverage than Form A-99, which was used by
Plaintiff, as Form CG would have granted coverage to Hathaway as to all claims "arising out"
of Reinhardt's (the named insured's) work.  (SF at ¶ 13; 6:11-27.)  By contrast, the Form CG at
issue limits coverage to Hathaway "solely for liability due to [Reinhardt's] negligence."  (Id.)

1  |  This insurance is primary except when b. below applies. …

2  |  b.  Excess Insurance

3  |  This insurance is excess over:

4  |  …

5
6  |  (2)  Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement.

7
8  (Id., Ex. F. at 11.)

9  **F.  THE PRESENT LITIGATION AND THE PARTIES' MOTIONS**

On April 8, 2009, Plaintiff filed suit against Defendant, asserting the following claims: Equitable Contribution; Equitable Indemnity; and Equitable Subrogation.  By way of relief, Plaintiff seeks either: (1) a monetary award equal to the amounts paid by Plaintiff in the defense and indemnification of Hathaway in the Ramirez Action; or (2) a monetary award equal to the proportionate and equitable shares that should be paid by Defendant for the defense and indemnification of Hathaway in the Ramirez Action.  On May 7, 2009, Defendant removed the action to this Court on diversity jurisdiction grounds.

On December 22, 2009, Defendant filed a motion for summary judgment.  (Docket No. 31.)  On March 6, 2010, Plaintiff filed its opposition to Defendant's motion, as well as a cross-motion for summary judgment.  (Docket No. 42.)  A hearing on the parties' motions was held before this Court on April 6, 2010.

Defendant argues that Plaintiff's claims fail because, pursuant to the undisputed terms of the Subcontract and the insurance policies to Hathaway, Plaintiff's policy is primary and Defendant's policy is excess.  Because the amount paid by Plaintiff to settle the Ramirez Action did not exceed the general liability limit of $1 million in Plaintiff's policy, the excess insurance under Defendant's policy never came into play.  Defendant also argues that the indemnification provision of the Subcontract requiring Reinhardt (Plaintiff's named insured) to indemnify Hathaway (Defendant's named insured) precludes Plaintiff's claims.

1   On the other hand, Plaintiff argues that summary judgment should be granted in its

2   favor because Hathaway did not qualify as an "additional insured" under the additional insured

3   endorsement in Plaintiff's policy.  Alternatively, Plaintiff argues that the indemnification

4   provision of the Subcontract does not apply because it does not cover Hathaway's "sole

5   negligence."

6   **II.   LEGAL STANDARDS**

7      **A.   SUMMARY JUDGMENT**

8      Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment if

9   there is no genuine issue as to any material fact and the moving party is entitled to judgment as

10  a matter of law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The

11  moving party bears the initial burden of demonstrating the basis for the motion and identifying

12  the portions of the pleadings, depositions, answers to interrogatories, affidavits, and admissions

13  on file that establish the absence of a triable issue of material fact.  Celotex Corp. v. Catrett,

14  477 U.S. 317, 323 (1986).  If the moving party meets this initial burden, the burden then shifts

15  to the non-moving party to present specific facts showing that there is a genuine issue for trial.

16  Fed.R.Civ.P. 56(e); Celotex, 477 U.S. at 324; Matsushita Elec. Indus. Co. v. Zenith Radio

17  Corp., 475 U.S. 574, 586-87 (1986).

18     "On a motion for summary judgment, 'facts must be viewed in the light most favorable

19  to the nonmoving party only if there is a 'genuine' dispute as to those facts.'"  Ricci v.

20  DeStefano, -- U.S. --, 129 S.Ct. 2658, 2677 (2009) (quoting Scott v. Harris, 550 U.S. 372, 380

21  (2007)).  An issue of fact is "material" if, under the substantive law of the case, resolution of

22  the factual dispute might affect the outcome of the claim.  See Anderson, 477 U.S. at 248.

23  Factual disputes are genuine if they "properly can be resolved in favor of either party."  Id. at

24  250.  Accordingly, a genuine issue for trial exists if the non-movant presents evidence from

25  which a reasonable jury, viewing the evidence in the light most favorable to that party, could

26  resolve the material issue in his or her favor.  Id.  "If the evidence is merely colorable, or is not

27  significantly probative, summary judgment may be granted."  Id. at 249-50 (internal citations

28  omitted).

1

### B.   EQUITABLE CONTRIBUTION

2   "Equitable contribution … is the right to recover, not from the party primarily liable for

3   the loss, but from a co-obligor who shares such liability with the party seeking contribution.  In

4   the insurance context, the right to contribution arises when several insurers are obligated to

5   indemnify of defend the same loss or claim, and one insurer has paid more than its share of the

6   loss or defended the action without any participation by the others."  Reliance Nat. Indem. Co.

7   v. General Star Indem. Co., 72 Cal.App.4th 1063, 1078 (1999).  "As a general rule, there is no

8   contribution between a primary and an excess carrier."  Id.  "In equitable contribution cases,

9   the courts enforce primary and excess provisions in insurance contracts as long as the rights of

10   the policyholder are not affected."  Id. at 1080.[3]

11

### C.   EQUITABLE INDEMNITY

12   Equitable indemnity "applies in cases in which one party pays a debt for which another

13   is primarily liable and which in equity and good conscience should have been paid by the latter

14   party."  United Services Auto. Ass'n v. Alaska Ins. Co., 94 Cal.App.4th 638, 644-645 (2001)

15   (internal quotations omitted).  Thus, equitable indemnity is a loss-shifting procedure rather than

16   a loss-sharing procedure.  See Cal. Prac. Guide Ins. Lit. § 8:65.1 (the Rutter Group 2009).

17

### D.   EQUITABLE SUBROGATION

18   "Subrogation is defined as the substitution of another person in place of the creditor or

19   claimant to whose rights he or she succeeds in relation to the debt or claim."  Fireman's Fund

20   Ins. Co. v. Maryland Cas. Co., 65 Cal.App.4th 1279, 1291 (1998) (internal quotations omitted).

21   "By undertaking to indemnify or pay the principal debtor's obligation to the creditor or

22

---

23   [3] "Under well-settled insurance principles, there are two levels of insurance coverage,
primary and excess."  Id. at 1076.  "Primary coverage is insurance coverage whereby, under the
24   terms of the policy, liability attaches immediately upon the happening of the occurrence that
gives rise to liability …. 'Excess' or secondary coverage is coverage whereby, under the terms
25   of the policy, liability attaches only after a predetermined amount of primary coverage has been
exhausted."  Id.  "It is settled under California law that an excess or secondary policy does not
26   cover a loss, nor does any duty to defend the insured arise until all of the primary insurance has
been exhausted."  Id. at 1077.  Here, it is undisputed that the liability limit in Plaintiff's policy
27   was not exhausted by the settlement in the Ramirez Action.

28

claimant, the 'subrogee' is equitably subrogated to the claimant (or 'subrogor'), and succeeds to the subrogor's rights against the obligor." Id. "In the case of insurance, subrogation takes the form of an insurer's right to be put in the position of the insured in order to pursue recovery from third parties legally responsible to the insured for a loss which the insurer has both insured and paid." Id. at 1291-92. "As now applied [the doctrine of equitable subrogation] is broad enough to include every instance in which one person, not acting as a mere volunteer or intruder, pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter." Id. at 1292 (internal quotations omitted; brackets in original).

The right of subrogation is derivative. Id. An insurer entitled to subrogation is in the same position as an assignee of the insured's claim, and succeeds only to the rights of the insured. Id. "The subrogated insurer is said to 'stand in the shoes' of its insured, because it has no greater rights than the insured and is subject to the same defenses assertable against the insured. Thus, an insurer cannot acquire by subrogation anything to which the insured has no rights, and may claim no rights which the insured does not have." Id. at 1292-93 (internal quotations omitted).

## III.   DISCUSSION

### A.   PLAINTIFF'S CLAIMS TURN ON WHETHER DEFENDANT'S POLICY WAS PRIMARY

Pursuant to the terms of Defendant's insurance policy, in which Hathaway is a named insured, the coverage is primary unless the "excess insurance" exception applies. That exception states that the coverage "is excess over … [a]ny other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement." (SF, Ex. F. at 11.) However, the additional insured endorsement in Plaintiff's policy states that Hathaway is an additional insured "solely for liability due to [Reinhardt's] negligence specifically resulting

from '[Reinhardt's] work' for the additional insured [Hathaway] which is the subject of the written contract or written agreement."  (SF at ¶ 16; 7:14-8:18.) [4]

As a threshold matter, Plaintiff argues that Hathaway did not qualify as an additional insured with respect to the liability at issue (i.e., the Ramirez Action) because that liability was not "due to [Reinhardt's] negligence."  Therefore, Plaintiff argues, Defendant's policy was primary, and Plaintiff's policy was never triggered.  Specifically, Plaintiff argues that "during the course of the underlying litigation it became apparent that Valley Forge's insured [Reinhardt] had no duty to indemnify Zurich's insured [Hathaway] nor did it [Hathaway] qualify as an additional insured."  Plaintiff further argues that, as a result, it is entitled to recover defense and indemnification costs from Defendant, because Defendant "should have stepped in, taken over the defense and indemnification of its insured."

Indeed, in order to proceed under its claims for equitable contribution, equitable indemnity, and equitable subrogation, Plaintiff must establish that Defendant's policy was primary, i.e., that Hathaway did not qualify as an additional insured under Plaintiff's policy. As indicated, equitable contribution lies only where multiple insurers insure the same risk at the same level (i.e., all primary insurers) and one insurer pays the entire loss; that insurer may seek equitable contribution from the other insurer to obtain reimbursement for a portion of what it has paid.  See Reliance, 72 Cal.App.4th at 1078.  Likewise, for a claim of equitable indemnity to lie, Plaintiff must show that Defendant was "primarily liable" for the monies paid by Plaintiff.  See United Services Auto. Ass'n, 94 Cal.App.4th at 644-645.  Lastly, by its equitable subrogation claim, Plaintiff may only claim the rights that Defendant's insured (Hathaway) is entitled to under Defendant's policy.  See Fireman's Fund Ins. Co., 65 Cal.App.4th at 1292-93.  Thus, if Hathaway is only entitled to excess coverage under

_____

[4] "Insurance companies are free to, and commonly have, issued additional insured endorsements that specifically limit coverage to situations in which the additional insured is faced with vicarious liability for negligent conduct by the named insured."  Acceptance Ins. Co. v. Syufy Enters., 69 Cal.App.4th 321, 330 (1999).

Defendant's policy, it follows that Plaintiff cannot operate under a theory that Defendant's policy is primary.

### B. GENUINE ISSUES OF MATERIAL FACT REGARDING HATHAWAY'S STATUS AS AN ADDITIONAL INSURED PRECLUDE BOTH PARTIES' MOTIONS FOR SUMMARY JUDGMENT

As indicated, Hathaway is an additional insured under Plaintiff's policy "solely for liability due to [Reinhardt's] negligence specifically resulting from '[Reinhardt's] work' for the additional insured [Hathaway] which is the subject of the written contract or written agreement."

The evidence submitted by the parties creates a genuine issue of material fact as to whether the liability incurred by Hathaway in the Ramirez Action "was due to" Reinhardt's negligence resulting from its work under the Subcontract. While Reinhardt was not a party to the Ramirez Action due to worker's compensation issues, there are sufficient facts that could give rise to the conclusion that Reinhardt's negligence contributed to the accident. Specifically, Ramirez, Reinhardt's foreman for the canopy, noticed the gap between the canopy and the roof because "it looked different from other places." He told Carrasco, Reinhardt's foreman for the main roof, about the gap, but Carrasco failed to investigate it. Despite knowing about the gap, Carrasco and Ramirez allowed the Reinhardt crew to remain on the canopy. (SF, ¶¶ 28-29.) Fox, Hathaway's superintendent, told Ramirez to have his men spread out in doing their work removing the roofing membrane from the canopy roof . (Id., ¶¶ 28, 36.) Ramirez then instructed the other Reinhardt workers to spread out on the canopy roof. (Id., ¶ 30.) Moreover, Reinhardt's president testified that Reinhardt, and the Reinhardt foremen, were responsible for site safety on the project. (SF2, Ex. A at 8:14-16; 23:14-24:18.)

On the other hand, certain facts could also support the conclusion that Reinhardt's negligence did not contribute to the accident. For example, the Cal-OSHA investigation into Reinhardt's conduct lead to its conclusion that Reinhardt had not violated any California labor

1  code or rule in connection with the accident.[5]  Moreover, the evidence gives rise to the question

2  of whether the negligence of DES and/or Hathaway could have caused the accident.  Cal-

3  OSHA cited DES and Hathaway for "serious violations."  (SF, ¶¶ 22, 23.)  Specifically, the

4  Cal-OSHA citation against Hathaway characterized Hathaway as "[t]he controlling, creating,

5  correcting and exposing employer …."  (SF, Ex. G at 5.)  Additionally, DES's engineer, Tan,

6  was responsible for investigating the gap to determine whether it affected the structural

7  integrity of the canopy.  (SF at 31.)  Yet, Tan did not direct the Reinhardt workers to get off of

8  the roof.  (Id. at 42.)  Hathaway's superintendent, Fox, also testified that he did not ask the

9  Reinhardt workers to remove themselves from the roof during Tan's investigation.   (Id. at

10  66:3-9.)

11       In view of the evidence submitted, this Court concludes that a genuine issue of material

12  fact exists as to whether the liability incurred by Hathaway in the Ramirez Action "was due to"

13  Reinhardt's negligence.  On summary judgment, "[t]he judge's function is not himself to weigh

14  the evidence and determine the truth of the matter but to determine whether there is a genuine

15  issue for trial … Credibility determinations, the weighing of evidence, and the drawing of

16  legitimate inferences from the facts are jury functions …."  Anderson, 788 U.S. at 249-255;

17  see also Vickers v. U.S., 228 F.3d 944, 954 (9th Cir. 2000) ("if the question whether 'the

18  actor's conduct [was] a substantial factor in bringing about the plaintiff's harm' is 'open to

19  reasonable difference of opinion,' … summary judgment was improper.")  Accordingly, the

20  issue of whether Hathaway qualified as an additional insured under Plaintiff's policy is a

21  question for the jury.

22    **C.    DEFENDANT'S ARGUMENTS REGARDING THE INDEMNITY PROVISION IN THE**
23        **SUBCONTRACT**

24       As a final matter, Defendant dedicates significant briefing to the impact that the

25  indemnification provision of the Subcontract has on the coverage terms of the insurance

26  policies.  In this regard, the main case discussed by Defendant is Hartford Cas. Ins. Co. v. Mt.

27

28       [5] Cal-OSHA provisions are admissible to show a duty or standard of care.  Elsner v.
Uveges, 34 Cal. 4th 915, 935-36 (2005).

1  Hawley Ins. Co., 123 Cal.App.4th 278 (2004).  There, a subcontractor's insurer brought an

2  equitable contribution action against a general contractor's insurer, seeking payment of one-

3  half of defense and settlement expenses incurred in defending suit against general contractor

4  filed by injured employee of subcontractor.  Both policies in question were primary policies.

5  Id. at 285.  By a separate subcontract agreement, the subcontractor had agreed to indemnify the

6  general contractor for liabilities "arising out of or in any way connected with the performance"

7  of the subcontractor's work.  Id. at 289.  The Hartford court determined that the

8  indemnification agreement barred the subcontractor's insurer claims for equitable contribution.

9  Id. at 292.

10       As indicated above, the question remains open as to whether Defendant's policy was

11 primary or excess.  If Plaintiff's and Defendant's policies are determined to be both primary,

12 then the principles set forth in Hartford may inform the analysis.  However, to the extent

13 Defendant's policy is determined to be excess, Hartford is distinguishable.  See Reliance, 72

14 Cal.App.4th at 1081 (in discussing Rossmoor Sanitation Inc. v. Pylon, Inc., 13 Cal.App.4th 638

15 (the predecessor to Hartford) in an action by a primary carrier seeking contribution from an

16 excess carrier, stating "*Rossmoor* did not purport to establish a general rule that a contractual

17 indemnification agreement between an insured and a third party takes precedence over well-

18 established general rules of primary and excess coverage in an action between insureds

19 repeatedly articulated by California appellate courts.").

20       Therefore, the question of the impact, if any, that the indemnification provision of the

21 Subcontract agreement has on the insurance policies is not appropriate for summary

22 adjudication.

23 **IV.   CONCLUSION**

24       For the foregoing reasons,

25       IT IS HEREBY ORDERED THAT:

26       1.     Defendant's Motion for Summary Judgment is DENIED, and Plaintiff's Cross-

27 Motion for Summary Judgment is DENIED.

28

1    2.      This matter is REFERRED to the Chief Magistrate Judge or her designee for a

2  mandatory settlement conference to take place within sixty (60) days from the date of this

3  Order.

4    3.      A telephonic Case Management Conference is scheduled in this matter for

5  December 16, 2010 at 2:30 p.m.  The parties shall meet and confer prior to the conference and

6  shall prepare a joint Case Management Conference Statement which shall be filed no later than

7  ten (10) days prior to the Case Management Conference that complies with the Standing Order

8  for All Judges of the Northern District of California and the Standing Order of this Court.

9  Plaintiff shall be responsible for filing the statement as well as for arranging the conference

10  call.  All parties shall be on the line and shall call (510) 637-3559 at the above indicated date

11  and time.

12    4.      This Order terminates Docket Nos. 31 and 42.

13    IT IS SO ORDERED.

14  Dated: September 22, 2010                    _____
                                                  SAUNDRA BROWN ARMSTRONG
15                                                United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28