UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

VALLEY FORGE INSURANCE
COMPANY, a Corporation,

        Plaintiff,

   vs.

ZURICH AMERICAN INSURANCE
COMPANY and DOES 1-10,

        Defendants.

Case No:  C 09-2007 SBA

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

## I.    <u>INTRODUCTION</u>

Plaintiff Valley Forge Insurance Company ("Plaintiff") brings the instant insurance coverage dispute against Defendant Zurich American Insurance Company ("Defendant"), seeking reimbursement of defense and settlement expenses incurred in defending Defendant's insured in a state court personal injury action. The underlying action arose out of an accident that occurred during a construction project for which Plaintiff insured the roofing subcontractor and Defendant insured the general contractor. As will be set forth below, the Court concludes that, pursuant to an indemnification agreement entered into between the subcontractor and the general contractor prior to the commencement of the construction project, Defendant is not liable to Plaintiff in any amount. This order is the decision of the Court following a bench trial and the submission of post-trial briefs.

## II.    <u>BACKGROUND</u>

### A.    Factual History

The injuries giving rise to the underlying state court personal injury action occurred when a roof canopy on which four roofers were working collapsed. Second Amended

Stipulated Facts for Trial ("SF") ¶ 1, Dkt. 125.  The accident happened at the site of a construction project in Redwood City, California.  Part of the project involved the demolition of roof canopies attached to the exterior wall of a building.  Hathaway Dinwiddie Construction Company ("Hathaway") was the general contractor for the project.  Id. ¶ 4.  Hathaway contracted with Reinhardt Roofing, Inc. ("Reinhardt") for the removal and disposal of the existing roofs at the project site.  Id. ¶¶ 1, 9.  Plaintiff insured Reinhardt, while Defendant insured Hathaway.  Id. ¶¶ 5, 8.

The Subcontract Agreement ("Subcontract") entered into between Hathaway and Reinhardt included an indemnification provision ("indemnity agreement") whereby Reinhardt agreed to indemnify Hathaway of and from any and all claims and liabilities arising out of or in any way connected with or incidental to the performance of the work called for under the Subcontract.  SF ¶¶ 9, 13, Exh. C at 50.  While broad in scope, the indemnification agreement did not apply to damages or expenses arising from the sole negligence or willful misconduct of Hathaway.  Id. ¶ 13, Exh. C at 50.

Following the accident, the four injured Reinhardt roofers brought a personal injury action in state court against Hathaway.  SF ¶ 41, Exh. J.  Plaintiff accepted the defense and indemnity of Hathaway and incurred defense and settlement expenses in the amount of $1,065,617.26.  Id. ¶¶ 42-43.  After settling the state court action, Plaintiff commenced the instant action against Defendant, seeking reimbursement of the expenses it incurred in defending Hathaway, plus interest.  Plaintiff asserts three claims for relief:  equitable contribution, equitable indemnity, and equitable subrogation.

At the center of the parties' dispute is the question of whether the indemnification agreement entered into between Reinhardt and Hathaway applies.  Defendant contends that because the indemnification agreement required Reinhardt to indemnify Hathaway for the injuries arising out of the accident, Plaintiff cannot obtain reimbursement of the expenses it incurred in defending Hathaway in the underlying action.  Plaintiff disagrees, arguing that the indemnification agreement does not apply for two reasons:  (1) the accident did not arise out of, nor was it in any way connected with or incidental to, the performance of

Reinhardt's work under the Subcontract; and (2) the injuries to the Reinhardt roofers arose from the sole negligence of Hathaway.[1]

### B.    Witness Testimony

At trial, Plaintiff presented the testimony of Adolfo Ramirez ("Ramirez"), a Reinhardt employee.  Ramirez was the foreman of the roofing crew that was on the canopy at the time it collapsed.  During trial, Ramirez testified that he was unable to recall most of the details of the events leading up to the collapse.  His testimony consists almost entirely of his inability to recall details of the events at issue.  Notably, Ramirez refused to allow defense counsel to refresh his recollection of the relevant events through reference to his deposition testimony.

Plaintiff also attempted to present expert testimony from John Anthony Dolan ("Dolan") regarding the duties of roofers and general contractors related to on-site safety.  However, the Court found that Dolan was not qualified to render such opinions.  See Reporter's Transcript ("RT") at 68:19-22, 83:24-84:16.  The Court concluded that Dolan, who has a bachelor's degree in civil engineering, but no experience working as a general contractor in California and only a few hours of training related to roofer safety, did not have the expertise necessary to testify as to the standard of care for roofer safety applicable in California.  Id. at 84:1-3.

Defendant presented the testimony of two expert witnesses:  David Andrew VanDerostyne ("VanDerostyne") and Anthony Charles Milo ("Milo").  VanDerostyne, a structural engineer, was qualified to render expert opinions regarding forensic engineering, and the standard of care applicable to structural engineers.  VanDerostyne testified about the structural failure of the canopy.  He also testified that the architect and engineer for the

---

[1] As explained by the Court in a prior order, if Defendant establishes that the indemnification agreement applies, then Plaintiff cannot recover any amount from Defendant. Dkt. 96.  However, if Defendant fails to establish that the indemnification agreement applies, then the insurance policies govern.  Id.  If the insurance policies govern, the question is whether Hathaway was an additional insured such that Plaintiff's policy covers Hathaway, which is only the case if Reinhardt was solely negligent.  Id.  Because it is undisputed that Reinhardt was not solely negligent, SF ¶ 40, if the indemnification agreement does not apply, then Plaintiff is entitled to recover from Defendant. Dkt. 96.

1  project, DES Architects + Engineers ("DES"), did not satisfy the standard of care

2  applicable to structural engineers in the events leading up to the collapse of the canopy.

3  Milo, a roof consultant and roof failure analyst, was qualified to render expert opinions

4  regarding the standard of care for roofer safety applicable in California.  Milo testified that

5  Reinhardt fell below the standard of care in keeping its employees safe in the events

6  leading up to the collapse of the canopy.

7  **III.**    **FINDINGS OF FACT**

8      Having considered the stipulated facts submitted by the parties, the evidence

9  presented at trial, and the credibility of the witnesses, the Court makes the following

10  findings of fact pursuant to Federal Rule of Civil Procedure 52(a).  To the extent that any of

11  the findings of fact are more appropriately considered conclusions of law, they shall be

12  deemed as such.

13      **A.**    **The Relevant Entities and Their Relationships**

14      1.    The roofing project that the Reinhardt employees were engaged in at the time

15  of the accident was part of a larger demolition and construction project at Britannia Seaport

16  Center, 600 Chesapeak Drive, Redwood City, California ("the Project").  Slough Estates

17  USA, Inc. ("Slough") was the owner of the Project.  SF ¶ 2.

18      2.    For purposes of the Project, Slough contracted directly with an architect and

19  engineer, DES.  DES's primary on-site engineer was Swee Yong-Tan ("Tan").  SF ¶ 3.

20      3.    Slough also contracted directly with a general contractor, Hathaway.

21  Hathaway's daily on-site superintendent was Gary Fox ("Fox").  SF ¶ 4.  On the day of the

22  accident, Hathaway was insured by Defendant under Policy No. GLO 3991447 01,

23  effective October 1, 2005 to October 1, 2006.  Id. ¶ 5.

24      4.    The Project required, among other things, the removal of the existing roofs,

25  including the main roof of a building and the canopy roofs attached to that building.

26  Hathaway contracted directly with Reinhardt for the removal and disposal of the existing

27  roofs.  SF ¶ 6, Exh. C.

28

5.      Reinhardt assigned two foremen to the roofing project, Fidel Carrasco ("Carrasco") and Ramirez.  SF ¶¶ 6-7.  Carrasco was the foreman of the roofing crew assigned to remove the main roof, while Ramirez was the foreman of the roofing crew assigned to remove the canopy roofs.  Id.

6.      On the day of the accident, Reinhardt was insured by Plaintiff under Policy No. TCP 2070848272-02, effective May 1, 2005, to May 1, 2006.  SF ¶ 8.

**B.      The Collapse of the Canopy**

**1.      The Events Leading Up to the Collapse**

7.      On October 11, 2005, one of the canopy roofs ("canopy") collapsed,[2] injuring Ramirez and three members of his crew.  SF ¶¶ 6, 22.

8.      Prior to the collapse, Ramirez observed a gap between the canopy and the wall of the building to which it was attached.  SF ¶ 28.  Ramirez informed Carrasco about the gap because it was different from the other canopy roofs he had observed.  Id. ¶ 29.

9.      At the time of the collapse, Carrasco had worked for Reinhardt for approximately twenty-six years and had been a foreman for twenty years.  SF ¶ 31.  In his twenty-two years as a roofer, Carrasco had never seen a gap like the one described by Ramirez.  Id. ¶ 32.  Carrasco, however, did not consider it his job to inspect the gap.[3]  Id. ¶ 33.  As such, he did not inspect the gap himself.  Instead, he told Ramirez to show the gap to Hathaway's on-site superintendent, Fox.  Id. ¶ 30.

10.      Ramirez followed Carrasco's suggestion and reported the gap to Fox.  SF ¶ 35.  Ramirez asked Fox to take a look at the gap because it looked different from the other roof canopies.  Id. ¶ 36.

11.      Thereafter, Fox and Tan, DES's on-site engineer, inspected the gap.  SF ¶ 37.  During their inspection, Fox and Tan asked Ramirez to remove some of the material from the canopy so that they could determine the extent of the gap.  Id.

---

[2] The canopy was about twelve feet above the ground.  SF ¶ 1.

[3] Carrasco was not Ramirez's supervisor or boss.  SF ¶ 34.

12.     After Ramirez did so, Fox, Tan, and Ramirez observed that the gap was forty-one feet long.[4]  SF ¶ 37.  Fox then told Ramirez to have his men spread out on the canopy.  Id. ¶ 39.  Ramirez followed Fox's instruction and directed his men to spread out on the canopy.  Id.

13.     Tan and Fox then left the area to inspect another canopy to determine if the gap was abnormal.  RT at 192:12-17.  However, before they completed their inspection, the canopy that Ramirez and his crew were on collapsed.[5]  Id. at 187:22-188:6.

14.     At the time of the collapse, Ramirez and three members of his crew were on the canopy removing the roofing membrane, in accordance with the Subcontract.  SF ¶¶ 1, 22, 38.

## 2.     The Cause of the Collapse

15.     At trial, only one expert witness, VanDerostyne, testified as to the cause of the collapse.

16.     Shortly after the accident, VanDerostyne inspected the Project site on behalf of the insurer of the building's owner to determine the cause of the collapse.  RT at 95:13-24.  In the course of his inspection, VanDerostyne documented the condition of both the structure of the canopy and the concrete wall to which it was attached.  He also performed

---

[4] At trial, Ramirez testified that:  (1) he did not remember removing any roofing material to show Tan and Fox the extent of the gap; and (2) the gap was not forty-one feet long but rather "more or less about a foot and a half."  RT at 35:22-36:8.  However, the parties have stipulated that Fox and Tan asked Ramirez to remove some of the roofing material on the canopy to reveal the extent of the gap, that Ramirez did in fact remove said roofing material, and that when he did so, "they all saw" that the gap was forty-one feet long.  See SF ¶ 37.  Given Ramirez's failure to remember the details of the events leading up to the collapse, coupled with his refusal to allow defense counsel to refresh his recollection with his deposition testimony, the Court was convinced Ramirez was deliberately ignorant, doubted the credibility and reliability of his trial testimony and, therefore, gives it little weight.

[5] The parties did not stipulate to any facts regarding the details of Tan's inspection of the gap.  However, the parties previously stipulated that Tan had yet to complete his inspection of the gap at the time of the canopy collapse.  See Dkt. 61, 3:3-14.  Furthermore, at trial, Milo testified that, at the time of the collapse, Tan and Fox had walked away from the canopy to inspect other canopies, RT at 187:7-188:2,192:12-17.  At trial, defense counsel stated, without objection, that it was undisputed that Tan was in the process of his investigation when the canopy collapsed.  Id. at 188:3-4.

various calculations to analyze the cause of the collapse.  Id. at 96:1-97:9.  Following his inspection, VanDerostyne prepared a report, concluding that two factors had contributed to the collapse:  (1) the deterioration of the nails that secured the canopy to the building; and (2) the weight of the Reinhardt roofers on the canopy.  Id. at 97:6-12.

17.     At trial, VanDerostyne testified that the canopy was a fairly light structure, which had been attached to the outer wall of the building primarily for aesthetic purposes. RT at 99:14-20, 100:13-21.  He further testified that steel frames, or brackets, supported the weight of the canopy against the building, and that the frames were connected to the building by nails.  Prior to the collapse, some of the nails securing the canopy to the building had failed.  Id. at 103:2-4.  As a consequence, the canopy had separated from the building, resulting in the gap observed by Ramirez, Fox, and Tan.  Id. at 103:5-13; SF ¶ 37.

18.     According to VanDerostyne, the weight of the roofers caused the remaining nails to pull out of the building and the canopy to collapse.  RT at 104:18-21. VanDerostyne testified that the canopy would not have collapsed if the roofers had not been on it, nor would it have collapsed if it had been in good condition.  See id. at 103:23-104:1, 115:1-6.  In other words, in a non-deteriorated condition, the canopy would have supported its own weight and the weight of the roofers.  However, in its deteriorated condition, the canopy could not support both its own weight and the weight of the roofers.

19.     VanDerostyne testified that between the time he wrote his report following the accident and the time of trial, he reviewed additional information regarding the accident, including information regarding the condition of the canopy prior to its collapse. RT at 97:13-24.  VanDerostyne testified that the information he reviewed did not alter his conclusion as to the cause of the collapse.  Id. at 97:25-98:8.

20.     Plaintiff presented no evidence at trial contradicting or calling into question VanDerostyne's testimony, and the Court has no reason to doubt VanDerostyne's credibility.  As such, the Court finds VanDerostyne to be credible and gives his uncontradicted testimony significant weight.

### 3. DES's Negligence Regarding the Collapse

21.     The parties stipulate that DES, the architect and engineer for the Project, was concurrently and contributorily negligent along with Hathaway for the injuries sustained by the Reinhardt roofers because neither DES nor Hathaway advised the roofers to get off the canopy.  SF ¶ 40.

22.     With respect to DES's negligence, the parties' stipulation is supported by the testimony of VanDerostyne.  He testified that, after observing the gap between the canopy and the building to which it was attached, DES's on-site engineer (i.e., Tan) should have recognized the significant safety issue presented and informed Hathaway that it was unsafe for the Reinhardt roofers to be working on the canopy.  RT at 106:15-21.  VanDerostyne opined that DES fell below the standard of care because Tan failed to properly identify a life safety issue.  Id. at 107:3-4.  VanDerostyne's testimony on this issue is uncontradicted. As indicated above, the Court finds VanDerostyne to be credible and gives his uncontradicted testimony significant weight.

### 4. Reinhardt's and Ramirez's Conduct Regarding the Collapse

23.     Reinhardt was responsible for job site safety associated with its work on the Project.  SF ¶ 23; see also RT 128:8-21.  More specifically, Reinhardt's superintendent, Carl Boyer ("Boyer"), and its foremen, Ramirez and Carrasco, were responsible for job site safety related to the roofing portion of the Project.  SF ¶ 23.

24.     Pursuant to company policy, Reinhardt's employees were not permitted to work on any roof or canopy in potentially hazardous or dangerous conditions.  SF ¶ 23.  If Reinhardt employees observed any kind of danger, they were required to leave the area of danger.  Id.  Reinhardt's employees did not need permission to do so.  Id.

25.     Furthermore, pursuant to Reinhardt's Injury and Illness Prevention Program ("IIPP"), every foreman was required to "enforce the entire safety program at the work level" and to "conduct daily job safety inspections before and at the end of each work day." SF ¶ 24.  Notwithstanding this policy, Reinhardt never told Ramirez to conduct daily job site safety inspections at the beginning and end of each work day.  Id. ¶ 25.

26.     Ramirez did not conduct a job site safety inspection on the day before or the day of the canopy collapse.  SF ¶¶ 26-27.

27.     At trial, Ramirez testified that he did not remember if Reinhardt asked him to conduct daily job site safety inspections, and that he did not remember conducting any safety inspections of the canopy prior to its collapse.[6]  RT at 29:3-30:25, 31:23-32:10. Ramirez further testified that "we don't go around inspecting that [i.e., the canopy]. . . . The job we do is install and replace the roof.  We are not allowed to be wasting time doing those things that you're asking about [i.e., safety inspections]."  Id. at 44:6-11.  Ramirez also testified that he didn't remember whether Reinhardt provided him with any training to become a foreman or whether he attended any safety meeting while working for Reinhardt.[7] Id. at 22:17-25:25, 26:8-10.

28.     Ramirez testified that his recollection of the events leading up to the collapse of the canopy was better when he was deposed in connection with the underlying state court action.  RT at 48:3-6.  However, despite his professed inability to remember the details of the relevant events and his acknowledgement that his recollection of such events was better on the dates his deposition was taken, Ramirez refused to allow defense counsel to refresh his recollection through reference to his deposition.  See, e.g., id. at 29:16-25, 35:12-16.  As previously indicated, given Ramirez's inability to remember many of the details of the events leading up to the collapse of the canopy and his refusal to allow defense counsel to refresh his recollection, the Court doubts the credibility and reliability of his trial testimony and therefore gives it little weight.

29.     At trial, only one expert witness, Milo, testified as to the standard of care for roofer safety applicable in California.  Milo testified that, pursuant to the applicable standard of care, the foreman of a roofing project should conduct daily job site safety

---

[6] Ramirez testified that he was "not an inspector," and said:  "I go [to the job site] to work. . . .  I have nothing to do with inspection."  RT at 32:2-3, 47:1-4.

[7] In his deposition, Ramirez testified that he was not provided with any training to become a foreman.  See SF, Exh. O at 163:1-3.

inspections to determine whether the site is safe for his crew.  RT at 126:12-21, 172:12-18. According to Milo, the standard of care in California does not allow a roofer to delegate responsibility for on-site safety to a third party.  Id. at 128:2-6.[8]

30.     In addition, Milo testified that, although Reinhardt's official policies were consistent with the standard of care for roofer safety in California, RT at 129:10-130:4; see also SF ¶ 24, Reinhardt nonetheless fell below the standard of care by failing to properly train Ramirez to conduct daily job site safety inspections at the beginning and end of each work day to identify potentially dangerous conditions.  RT at 126:2-11, 130:5-131:3.

31.     Milo also testified that Reinhardt fell below the standard of care because Ramirez failed to remove his crew from the canopy after observing the gap between the canopy and the building to which it was attached.  RT at 126:2-11, 161:2-3, 165:3-7, 168:24-169:13.  According to Milo, pursuant to the standard of care for roofer safety, Ramirez should have recognized that the gap was a potentially hazardous situation and removed his crew from the canopy.  Id. at 151:24-25, 153:17-154:11.

32.     Milo opined that Ramirez should have recognized the gap as a potential safety hazard because:  (1) Ramirez observed that no other canopy had such a gap, indicating that the canopy was different from the other canopies and thus potentially dangerous, RT at 162:3-6,180:13-16; and (2) the general contractor's on-site superintendent (i.e., Fox) told Ramirez to have his men spread out on the canopy, thereby putting Ramirez on notice that the gap presented a potentially dangerous condition.  Id. at 163:6-165:7. Milo testified that the fact that Ramirez was concerned enough to notify both Carrasco and Fox about the existence of the gap was a factor supporting his opinion that Ramirez should have removed his crew from the canopy.  Id. at 169:4-13.

---

[8] Milo further testified that, pursuant to the standard of care in the roofing industry, safety meetings should be held weekly, and that there should be a safety meeting specific to each individual project.  RT at 133:9-15.  The trial record does not reflect whether Reinhardt held any safety meetings, and the parties did not stipulate to any facts regarding such meetings.  As such, the Court makes no findings or conclusions regarding safety meetings.

33.     Milo further testified that, pursuant to the standard of care, Ramirez should have notified Reinhardt's superintendent (i.e., Boyer) about the gap.  RT at 134:2-5.  Milo opined that, although Ramirez notified the senior on-site foreman (i.e., Carrasco) about the gap, Ramirez nevertheless fell below the standard of care by failing to notify Boyer.  Id. at 134:6-16, 160:19-22.  Milo also opined that Carrasco fell below the standard of care by failing to notify Boyer about the gap.  Id. at 154:12-155:2, 158:17-22.

34.     Plaintiff presented no evidence at trial contradicting or calling into question Milo's testimony, and the Court has no reason to doubt Milo's credibility.  As such, the Court finds Milo to be credible and gives his uncontradicted testimony significant weight.

**C.     The Underlying Personal Injury Action**

35.     On December 5, 2006, the four injured Reinhardt roofers filed a complaint for negligence and premises liability in San Francisco Superior Court.  SF ¶ 41.  The action was entitled Ramirez v. Hathaway Dinwiddie, Case No. CGC-06-458439 ("the Ramirez Action").  Id.  Both Hathaway and DES were named as defendants in the Ramirez Action. Id.  Reinhardt was not named as a defendant because of the exclusive remedy of worker's compensation for injured employees, and none of the defendants filed a cross-complaint against Reinhardt.  Id.

36.     On April 17, 2007, Plaintiff accepted the defense and indemnity of Hathaway under a full reservation of rights.  SF ¶ 42.

37.     On February 7, 2008, the Ramirez Action settled for $1,155,000 as to all defendants.  SF ¶ 44.  DES paid $250,000, while Plaintiff paid $905,000 on behalf of Hathaway.  Id.  Plaintiff also incurred $160,617.26 in defense costs.  Id. ¶ 43.

38.     Thereafter, Plaintiff commenced the instant action against Defendant, seeking reimbursement for the defense and settlement expenses it incurred in defending Hathaway in the Ramirez Action.

///

///

///

**D.      Relevant Provisions of the Subcontract and Insurance Policies**

**1.      Subcontract**

39.      Prior to the collapse of the canopy, Hathaway and Reinhardt entered into a subcontract (i.e., the Subcontract).  SF ¶ 9, Exh. C.

40.      According to the parties, the Subcontract is authentic and enforceable, and its terms represent the intent of Reinhardt and Hathaway.  SF ¶ 10.

41.      Prior to the execution of the Subcontract, Hathaway sent Reinhardt several documents explaining its insurance requirements for the roofing project.  SF ¶ 14, Exh. D.

42.      Reinhardt agreed to Hathaway's insurance requirements.  Under Article 5.1 of the Subcontract, Reinhardt agreed to obtain insurance naming Hathaway as an additional insured under Reinhardt's general and excess insurance policies.  Id. ¶¶ 11-12, Exh. C at 49.  Article 5.1 provides that the subcontractor insurance coverage "shall include liability for all injuries and damages referred to in Article 6, 'Indemnity.' "  Id.  Pursuant to Article 5.1, the policy "shall be primary" to Hathaway's coverage with Defendant and "neither the Owner's nor [Hathaway's] policies will be called to contribute with the Subcontractor's polic(ies)."  Id. ¶ 11, Exh. C, 49, 55.  Article 5.1 further required that the insurance policy include a waiver of any claim on the part of the insurer for subrogation on payment of loss or otherwise against Hathaway.  Id. at ¶¶ 11-12 & Exh. C, 49, 55.

43.      The Subcontract required Reinhardt to furnish Hathaway with a certificate verifying that insurance had been obtained prior to the commencement of the work under the Subcontact "by use of Insurance Services Form CG 20 10 11 85 or its equivalent[.]"  SF, Exh. C at 49, 55.

44.      The Subcontract contains an indemnity agreement.  SF, Exh. C at 50.  Article 6.1 of the Subcontract provides:

> Subcontractor [Reinhardt] shall indemnify and save harmless Contractor [Hathaway] and Owner [Slough] . . . of and from any and all claims, demands, causes of action in law or in equity, damages, penalties, costs, expenses, actual attorneys' fees, experts' fees, consultants' fees, judgments, losses or liabilities, of every kind and nature whatsoever *arising out of or in any way connected with or incidental to, the performance of the Work under this Subcontract* or any of the obligations contained

in this Subcontract ("Claims").  The obligations under this Article 6 *shall apply to any acts or omissions, willful misconduct or negligent conduct, whether active or passive, on the part of the Subcontractor*, its subcontractors, agents, consultants, materialmen, employees, officers and/or partners.

SF ¶ 12, Exh. C at 50 (emphasis added).

45.     Under Article 6.2 of the Subcontract:  "The Subcontractor agrees, at its own cost, expense and risk to defend the indemnitees against any Claims as defined in this Article that may be brought or instituted by third persons, including, but not limited to, government agencies or employees of Subcontractor."  SF ¶ 12, Exh. C at 50.

46.     Article 6.3 of the Subcontract provides:

It is expressly acknowledged and agreed that each of the foregoing indemnities is independent, that each shall be given effect, and that each shall apply despite any acts and omissions, misconduct or negligent conduct, whether active or passive, on the part of Contractor, Owner or other indemnitee; *except that the duty to indemnify or hold harmless a particular indemnitee shall not be applicable to damages for death or bodily injury to persons, injury to property, or any other loss, damage, or expense arising from the sole negligence or willful misconduct of such particular indemnitee, its agents, servants, or independent contractors who are directly responsible to such particular indemnitee*, excluding Subcontractor herein.

SF ¶ 12, Exh. C at 50 (emphasis added).

47.     Article 6.5 of the Subcontract provides:

The insurance requirements articulated in Article 5 and the Conditions of Insurance are separate and distinct from other obligations contained in the Subcontract, including, without limitation, the obligations contained in Article 6; and Subcontractor's Indemnification obligations under this Subcontract shall not be limited in any way by any limitation on the amount or type of insurance which may be available to Subcontractor.

SF ¶ 12, Exh. C at 50.

## 2.     Insurance Policy Issued to Reinhardt

48.     On September 6, 2005, Plaintiff issued Reinhardt a certification of insurance naming Hathaway as an additional insured.  SF ¶ 17, Exh. E.  The policy contains an "Other Insurance" clause that states, in part, "[t]his insurance is excess over any other insurance naming additional insured as an insured whether primary, excess, contingent or on any other basis unless a written contract or written agreement specifically requires that

this insurance be either primary or primary and noncontributing to the additional insured's own coverage." SF ¶ 18, Exh. E.

49.     The insurance policy was obtained using form G-140331-A99 ("Form A99"), rather than Form CG 20 10 11 85 ("Form CG").[9] SF ¶ 20. Form A-99 covers Hathaway, the additional insured, "solely for liability due to [Reinhardt's] negligence specifically resulting from '[Reinhardt's] work' for the additional insured which is subject of the written contract or written agreement." Id., Exh. E.

50.     Plaintiff's policy has a general liability limit of $1 million per occurrence and $2 million in the aggregate. SF ¶ 8.

51.     Prior to Reinhardt's commencement of work under the Subcontract, the insurance certificate, including the Form A-99, was submitted to Hathaway. SF ¶ 20. Hathaway did not object to the use of Form A-99 rather than Form CG. Id. ¶ 21.

### 3.     Insurance Policy Issued to Hathaway

52.     The insurance policy issued by Defendant to Hathaway includes an "Other Insurance" section, which purports to reduce Defendant's liability under the policy to the extent that "other valid and collectible insurance is available to the insured a loss we cover." SF ¶ 19. The "Other Insurance" section provides that the insurance policy is a primary policy except when the insurance is excess over any other primary insurance available to Hathaway. Id. This section also provides that when the insurance is excess over other insurance Defendant will only pay its share of the amount of the loss, if any, that exceeds the sum of:  "The total amount that such other insurance would pay for the loss in the absence of this insurance[.]" Id.

## IV.     CONCLUSIONS OF LAW

Having considered the stipulated facts submitted by the parties, the evidence presented at trial, the credibility of the witnesses, and the legal arguments presented by

---

[9] As explained by the Court in a prior order, Form CG would have provided broader coverage than Form A-99, as Form CG would have granted coverage to Hathaway as to all claims "arising out of" Reinhardt's work, while Form A-99 limited coverage "solely for liability due to [Reinhardt's] negligence." See Dkt. 61, n. 2.

counsel, the Court makes the following conclusions of law pursuant to Rule 52(a).  To the extent that any of the conclusions of law are more appropriately considered findings of fact, they shall be deemed as such.

**A.    Jurisdiction and Venue**

1.    The Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.

2.    Venue is proper in the Northern District of California because the acts or omissions complained of occurred in this District.  28 U.S.C. § 1391(b).

**B.    Discussion**

**1.    Equitable Principles**

**a.    Equitable Contribution**

3.    "Equitable contribution . . . is the right to recover, not from the party primarily liable for the loss, but from a co-obligor who shares such liability with the party seeking contribution.  In the insurance context, the right to contribution arises when several insurers are obligated to indemnify or defend the same loss or claim, and one insurer has paid more than its share of the loss or defended the action without any participation by the others."  Reliance Nat. Indem. Co. v. General Star Indem. Co., 72 Cal.App.4th 1063, 1078 (1999).  "Equitable contribution permits reimbursement to the insurer that paid on the loss for the excess it paid over its proportionate share of the obligation, on the theory that the debt it paid was equally and concurrently owed by the other insurers and should be shared by them pro rata in proportion to their respective coverage of the risk."  Hartford Casualty Insurance v. Mount Hawley Insurance Company, 123 Cal. App.4th 278, 287 (2004).  The purpose of this rule is to accomplish substantial justice by equalizing the common burden shared by coinsurers, and to prevent one insurer from profiting at the expense of others.  Maryland Casualty Co. v. Nationwide Mutual Ins. Co., 81 Cal.App.4th 1082, 1089 (2000).  Generally, there is no contribution between a primary and an excess carrier without a specific agreement to the contrary.  Reliance, 72 Cal.App.4th at 1080.  "In equitable

1  contribution cases, the courts enforce primary and excess provisions in insurance contracts

2  as long as the rights of the policyholder are not affected." Id. at 1080.[10]

3      4.    In an action by an insurer to obtain contribution from a coinsurer, the inquiry

4  is whether the nonparticipating coinsurer had a legal obligation to provide a defense or

5  indemnity coverage for the claim or action prior to the date of settlement, and the burden is

6  on the party claiming coverage to show that a coverage obligation arose or existed under

7  the coinsurer's policy.  Safeco Ins. Co. of Am. v. Superior Court, 140 Cal.App.4th 874, 879

8  (2006).  "[I]n an action for equitable contribution by a settling insurer against a

9  nonparticipating insurer, the settling insurer has met its burden of proof when it makes a

10  prima facie showing of coverage under the nonparticipating insurer's policy—the same

11  showing of potential coverage necessary to trigger the nonparticipating insurer's duty to

12  defend[.]" Id. at 881.  "[T]he burden of proof then shifts to the recalcitrant insurer to prove

13  the absence of actual coverage." Id.

14      **b.**    **Equitable Indemnity**

15      5.    Equitable indemnity "applies in cases in which one party pays a debt for

16  which another is primarily liable and which in equity and good conscience should have

17  been paid by the latter party."  United Services Auto. Ass'n v. Alaska Ins. Co., 94

18  Cal.App.4th 638, 644-645 (2001) (internal quotation marks omitted).  Equitable indemnity

19  is thus a loss-shifting procedure rather than a loss-sharing procedure.  See Cal. Prac. Guide

20  Ins. Lit. § 8:65.1 (Rutter Group 2009).

21

22

---

23      [10] "Under well-settled insurance principles, there are two levels of insurance

24  coverage, primary and excess."  Reliance, 72 Cal.App.4th at 1076.  "Primary coverage is
insurance coverage whereby, under the terms of the policy, liability attaches immediately

25  upon the happening of the occurrence that gives rise to liability. . . .  'Excess' or secondary
coverage is coverage whereby, under the terms of the policy, liability attaches only after a

26  predetermined amount of primary coverage has been exhausted."  Id.  "It is settled under
California law that an excess or secondary policy does not cover a loss, nor does any duty

27  to defend the insured arise until all of the primary insurance has been exhausted."  Id. at
1077.  Here, it is undisputed that the liability limit in Plaintiff's policy was not exhausted

28  by the settlement of the Ramirez Action.

### c.     Equitable Subrogation

6.     "Subrogation is defined as the substitution of another person in place of the creditor or claimant to whose rights he or she succeeds in relation to the debt or claim." Fireman's Fund Ins. Co. v. Maryland Cas. Co., 65 Cal.App.4th 1279, 1291 (1998) (internal quotation marks omitted).  "By undertaking to indemnify or pay the principal debtor's obligation to the creditor or claimant, the 'subrogee' is equitably subrogated to the claimant (or 'subrogor'), and succeeds to the subrogor's rights against the obligor."  Id.  "In the case of insurance, subrogation takes the form of an insurer's right to be put in the position of the insured in order to pursue recovery from third parties legally responsible to the insured for a loss which the insurer has both insured and paid."  Id. at 1291-1292.  The doctrine of equitable subrogation "is broad enough to include every instance in which one person, not acting as a mere volunteer or intruder, pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter."  Id. at 1292 (internal quotations omitted, brackets in original).

7.     The right of subrogation is derivative.  Fireman's Fund, 65 Cal.App.4th at 1292.  An insurer entitled to subrogation is in the same position as an assignee of the insured's claim and succeeds only to the rights of the insured.  Id.  "The subrogated insurer is said to 'stand in the shoes' of its insured, because it has no greater rights than the insured and is subject to the same defenses assertable against the insured.  Thus, an insurer cannot acquire by subrogation anything to which the insured has no rights, and may claim no rights which the insured does not have."  Id. at 1292-1293 (internal quotation marks omitted).

### 2.     Effect of the Indemnity Agreement

8.     Defendant contends that it is not liable for any of the expenses incurred by Plaintiff in defending Hathaway in the Ramirez Action based on the indemnity agreement entered into between Reinhardt and Hathaway.  According to Defendant, because its insured (i.e., Hathaway) is not liable to Plaintiff's insured (i.e., Reinhardt) under the indemnity agreement, Plaintiff is precluded from recovering any amount from Defendant.  In support of its position, Defendant cites Hartford.

9.      In <u>Hartford</u>, a subcontractor agreed to indemnify a general contractor for claims and liabilities arising out of the subcontractor's performance, and to secure a commercial general liability policy listing the subcontractor as the named insured and the general contractor as an additional insured.  <u>Hartford</u>, 123 Cal.App.4th at 281.  After an employee of the subcontractor was injured while construction was in progress, the employee sued the general contractor.  <u>Id.</u>  The subcontractor's insurer defended and settled the personal injury suit on behalf of the general contractor.  <u>Id.</u>  The subcontractor's insurer then sued the general contractor's insurer, seeking reimbursement of one-half of the defense and settlement expenses under a theory of equitable contribution.  <u>Id.</u> at 281, 285-286.  Similar to the instant action, the general contractor's insurer argued that it was not liable for any amount based on the indemnity provision in the construction contract.  <u>Id.</u> at 281.  The trial court granted summary judgment in favor of the subcontractor's insurer.  <u>Id.</u>

10.      The Court of Appeal reversed, holding that because the general contractor was not liable to the subcontractor under the indemnity provision, the general contractor's insurer was not liable to the subcontractor's insurer.  <u>Hartford</u>, 123 Cal.App.4th at 282, 288-289, 292.  The court concluded that because the subcontractor in <u>Hartford</u> had agreed to indemnify and hold harmless the general contractor, absent the general contractor's sole negligence or willful misconduct, and because the general contractor was shown not to be solely negligent or to have engaged in willful misconduct, the general contractor's insurer was not required to provide equitable contribution.  <u>Id.</u> at 289, 291-292 ("We conclude that, just as the general contractor is not liable to the subcontractor under the indemnity provision, so the general contractor's own insurer is not liable to the subcontractor's insurer.").  The court reasoned that to require the general contractor's insurer to pay the subcontractor's insurer, when the general contractor was not liable for anything due to the indemnity provision, would effectively negate the indemnity agreement, and would be inconsistent with equitable principles designed to accomplish ultimate justice and would not further the goal that each insurer pay its "fair share."  <u>Id.</u> at 292 (noting that it would be "unjust" to impose liability on the general contractor's insurer when the general contractor

bargained with the subcontractor to avoid that very result as part of the consideration for the construction agreement); see also Rossmoor Sanitation, Inc. v. Pylon, Inc.,13 Cal.3d 622, 634-635 (1975) (indemnity provision affects allocation of liability in insurance action even where "other insurance" provision available).

11.     As previously indicated, if the indemnity agreement applies, the indemnification agreement, not equitable insurance principles or the terms of the insurance policies, governs whether Plaintiff may recover from Defendant.  See Hartford, 123 Cal.App.4th at 289-298.[11]  Plaintiff contends that the indemnity agreement does not apply because the injuries sustained by the Reinhardt roofers did not arise out of, nor were they in any way connected with or incidental to, Reinhardt's work under the Subcontract, and because the injuries in question arose from Hathaway's sole negligence.

### 3.     Whether the Indemnity Agreement Applies

12.     Where parties have expressly contracted with respect to the duty to indemnify, the extent of that duty must be determined from the contract, not from independent equitable principles such as equitable indemnity.  See Rossmoor, 13 Cal.3d at 628.  "[T]he question [of] whether an indemnity agreement covers a given case turns primarily on contractual interpretation, and it is the intent of the parties as expressed in the agreement that should control. " Id. at 632.  "When the parties knowingly bargain for the protection at issue, the protection should be afforded." Id.  The analysis regarding the duty to indemnify "requires an inquiry into the circumstances of the damage or injury and the language of the contract; of necessity, each case will turn on its own facts."  Id.

13.     The intention of the parties to an indemnity agreement is to be ascertained from the clear and explicit language of the agreement.  Centex Golden Const. Co. v. Dale

---

[11] The principles discussed in Hartford do not "establish a general rule that a contractual indemnification agreement between an insured and a third party takes precedence over well-established general rules of primary and excess coverage." Reliance, 72 Cal.App.4th at 1081.  These principles only apply to insurers that share the same level of obligation on the risk as to the same insured. Id. at 1080.  As the Court explained in a prior order, the principles discussed in Hartford apply to the instant action because the insurance policies at issue are both primary policies.  Dkt. 96.  Neither party has argued, let alone shown, that this determination was incorrect.

Tile Co., 78 Cal.App.4th 992, 996 (2000).  Unless given some special meaning by the parties, the words of a contract are to be understood in their ordinary and popular sense.  Id. at 996-997.  In interpreting an express indemnity agreement, the courts look first to the words of the contract to determine the intended scope of the indemnity agreement.  Id. at 997.

<strong>a.    Arising Out of or in Any Way Connected With or Incidental To</strong>

14.    The Subcontract required Reinhardt to indemnify Hathaway of and from any and all claims or liabilities "arising out of or in any way connected with or incidental to" the performance of the work under the Subcontract.  See SF ¶ 13, Exh. C at 50.  Plaintiff contends that the injuries to the Reinhardt roofers did not arise out of, nor were they connected with or incidental to Reinhardt's work under the Subcontract, because the collapse of the canopy resulted from structural problems unrelated to Reinhardt's work.

15.    "California courts interpret the phrase 'arising out of' broadly to require only minimal causal connection[.]"  Fireman's Fund Ins. Companies v. Atl. Richfield Co., 94 Cal.App.4th 842, 849 (2001); see also Acceptance Ins. Co. v. Syufy Enterprises, 69 Cal.App.4th 321, 328 (1999).

16.    In Syufy, an employee of a contractor, who had been working on the roof of a theater, was injured while descending through a hatch that provided the only access to the worksite.  Syufy, 69 Cal.App.4th at 324.  The employee sued the owner of the theater, which sought and received a defense from the contractor's liability insurer pursuant to an additional insured endorsement added to the policy in accordance with the terms of the contractor's written agreement with the owner.  Id.  That endorsement provided that the owner would be covered under the policy, "but only with respect to liability arising out of" the contractor's work for the owner "performed by or on behalf of the contractor."  Id.  After the insurer settled the employee's suit, it brought an action against the owner of the theater seeking contribution or indemnification.  Id. at 325.  The trial court granted the owner's motion for summary judgment.  Id.

17.     The Court of Appeal affirmed, holding that the additional insured endorsement provided coverage for the contractor's employee's injury.  See Syufy, 69 Cal.App.4th at 328-330.  In reaching this conclusion, the court stated that California courts have consistently given a broad construction to the terms "arising out of" or "arising from" in various kinds of insurance provisions.  Id. at 328.  The court further stated that "[i]t is settled that this language does not import any particular standard of causation or theory of liability into an insurance policy.  Rather, it broadly links a factual situation with the event creating liability, and connotes only a minimal causal connection or incidental relationship."  Id.  The court concluded that "[u]nder this commonsense approach, [the employee's] injury clearly 'arose out of' the work he was performing on the roof of [the owner's] building."  Id. at 328.  The court found that "[t]he relationship between the defective hatch and the job was more than incidental, in that [the employee] could not have done the job without passing through the hatch."  Id.  The court noted that "[t]he fact that the defect was attributable to [the owner's] negligence is irrelevant, since the policy language does not purport to allocate coverage according to fault."  Id. at 328-329.

18.     In Fireman's Fund, an employee of a construction company was injured in the course of the work he was performing for an oil company at the oil company's plant.  Fireman's Fund, 94 Cal.App.4th at 845.  The injury arose from the collapse of a step owned and maintained by the oil company.  Id.  When the employee sued the oil company, the construction company's insurer defended the action on behalf of the oil company as an additional insured under the construction company's liability policy.  Id. at 846.  The endorsement provided that the oil company's entitlement to coverage was limited to " 'liability arising out of [the contractor's work] for [the oil company][.]' "  Id.  Following settlement of the employee's claim, the construction company's insurer sued the oil company to recover its defense and settlement costs.  Id. at 846.  The trial court granted the oil company's motion for summary judgment.  Id.

19.     The Court of Appeal affirmed.  Following the "commonsense approach" employed by the court in Syufy, the court held that the fact that the employee had been

injured while performing the construction company's work at its worksite was sufficient to establish the "minimum causal connection" to trigger coverage under the construction company's policy.  Fireman's Fund, 94 Cal.App.4th at 849-851.  The court noted that because the employee was engaged in a "work-related task at the time of accident . . . the connection between the insured's work and the liability-producing event" was even stronger than in Syufy because the accident in Syufy occurred while the employee was leaving work to take his wife to the airport, not while performing a work-related task.  Id. at 849-850.

20.    The Court finds that the injuries sustained by the Reinhardt roofers arose out of the performance of the work under the Subcontract.  At the time the canopy collapsed, the roofers were on top of the canopy performing work called for under the Subcontract. See SF ¶¶ 1, 22, 38.  Applying the "commonsense approach" employed by Syufy and Fireman's Fund, the fact that the roofers were injured while performing a work-related task is a sufficient causal connection to trigger the indemnification agreement.  See Fireman's Fund, 94 Cal.App.4th at 849, 851.  Indeed, the trial record establishes that the collapse of the canopy was directly connected to the work called for under the Subcontract. VanDerostyne testified that the presence of the roofers on the canopy was a contributing factor (along with the deteriorated condition of the canopy) to the collapse of the canopy. See RT at 97:6-12, 103:23-104:21, 115:1-6.  According to VanDerostyne, the canopy would not have collapsed if the roofers had not been on top of it.  Id. at 103:23-104:1, 115:1-6.

21.    Plaintiff contends that neither Syufy nor Fireman's Fund is applicable because those cases involved the interpretation of additional insured endorsements, while the instant action involves the interpretation of an indemnity agreement.  The Court is not persuaded by Plaintiff's argument.

22.    The contractual language analyzed in Syufy and Fireman's Fund is substantially similar to the language in the Subcontract.  Although both Syufy and Fireman's Fund involved the interpretation of additional insured insurance provisions, the

courts in those cases applied a "commonsense" definition to the plain language of "arising out of" in interpreting the provisions at issue in those cases.  See Syufy, 69 Cal.App.4th at 328; Fireman's Fund, 94 Cal.App.4th at 849.  The analyses in Syufy and Fireman's Fund were based on the substance of the contractual language—not the form of contract.  Accordingly, the fact that the form of the contract in this case is different than the contracts at issue in Syufy and Fireman's Fund is of no consequence.

23.     To the extent Plaintiff argues that the Court should construe the indemnity agreement as requiring a showing of fault on the part of Reinhardt, the Court rejects Plaintiff's argument.  In Continental Heller v. Amtech Mechanical Services, Inc., 53 Cal.App.4th 500 (1997), the court held that "an agreement by a subcontractor to indemnify a general contractor for loss 'which *arises out of or is in any way connected*' with the subcontractor's 'acts or omissions' in the performance of its work does not require a showing that the subcontrctor was at fault in causing the general contractor's loss . . ."  See id. at 503-505 (emphasis added).

24.     In Continental Heller, the general contractor settled claims against it arising out of an explosion caused by a defective valve installed by a subcontractor in a refrigeration system at a meat packing plant.  Continental Heller, 53 Cal.App.4th at 503.  The general contractor then brought suit against the subcontractor for contractual indemnity, seeking to recover the expenses it incurred in defending and settling the claims of the injured workers.  Id.  Based on the language of the indemnity provision in the subcontract, the trial court found that the subcontractor was liable for the amount the general contractor incurred in defending the underlying action, even though the subcontractor was found *not* to be at fault for the explosion.  Id. at 504-505.

25.     The Court of Appeal affirmed.  In doing so, the court rejected the notion that every claim for indemnity requires a showing of fault on the part of the indemnitor, finding that the contractual language before it "leaves no doubt the parties intended [that the subcontractor] should indemnify [the contractor] irrespective of whether [the contractor's] loss arose by reason of [the subcontractor's] negligence or for any other reason except for

the sole negligence or willful misconduct of [the contractor]." Continental Heller, 53 Cal.App.4th at 505 (stating that "courts will enforce indemnity agreements even for losses caused by acts over which the indemnitor has *no control*"). The court concluded that the subcontractor's duty to indemnify was triggered because the explosion and resulting injury arose out of or was connected with an act of the subcontractor, i.e., the installation of the faulty valve. Id. at 506. In reaching this conclusion, the court noted that "[t]he parties to an indemnity agreement enjoy 'great freedom of action' in allocating risk." Id. Further, the court found that the risk allocated in the indemnity provision was "commercially reasonable" given that between the subcontractor and the general contractor, the former was in the better position to protect against loss arising out of its performance of its contract because the subcontractor, not the general contractor, selected and installed the particular valve that subsequently failed leading to the explosion. Id. (noting that "the language of the agreement at issue -'arising out of or in any way connected' - is commonly found in indemnity agreements between contractors and subcontractors").

26.     The Court finds that the contractual language at issue in Continental Heller is substantially the same as the language at issue in this case in all relevant respects. See Continental Heller, 53 Cal.App.4th at 504-505; SF ¶ 13, Exh. C at 50. While Plaintiff contends that the instant action is distinguishable from Continental Heller because the employees in that case "installed the instrumentality" that caused the accident, while the roofers in this case had nothing to do with the "instrumentality" that resulted in the accident, the Court rejects Plaintiff's attempt to distinguish Continental Heller. Here, as in Continental Heller, Hathaway's entitlement to indemnity does not depend on a showing that Reinhardt was at fault for the collapse. Like in Continental Heller, the contractual language at issue in this case - "arising out of or in any way connected" - leaves no doubt that the contracting parties intended that Reinhardt indemnify Hathaway irrespective of whether Hathaway's loss arose by reason of Reinhardt's negligence or for any other reason except for the sole negligence or willful misconduct of Hathaway. See Continental Heller, 53 Cal.App.4th at 505. The language of the indemnity agreement imposes no requirement

that Hathaway prove that Reinhardt was negligent.  While such an allocation of risk to Reinhardt requires some expression in the agreement indicating that Reinhardt's conduct or fault is of no consequence in determining whether the indemnity obligation is triggered, this expression is present where, as here, the contract language provides that the duty to indemnify applies to "any acts or omissions, willful misconduct or negligent conduct, whether active or passive, on the part of the Subcontractor."  Centex, 78 Cal.App.4th at 998 (citing Continental Heller, 53 Cal.App.4th at 505) (quotation marks omitted).

27.     Plaintiff cites St. Paul Fire & Marine Insurance Co. v. American Dynasty Surplus Lines Insurance Co., 101 Cal.App.4th 1038 (2002), for the proposition that Reinhardt's duty to indemnify was never triggered because the collapse of the canopy was not caused by any act or omission of Reinhardt.  The Court disagrees.

28.     In St. Paul, a railroad retained a general contractor to perform construction work at a maintenance yard.  St. Paul, 101 Cal.App.4th at 1043.  The general contractor then contracted with a subcontractor to perform electrical work.  Id.  The subcontract entered into between the general contractor and subcontractor required the subcontractor to add the general contractor as an additional insured and to indemnify the general contractor for liability attributable to bodily injury "arising out of or resulting from the performance of the Work, either directly or indirectly, *provided that any such[ liability] . . . arises from or is alleged to have arisen in whole or in part by any act or omission of Subcontractor . . .*"[12] Id. at 1043-1044 (emphasis added).  Id.

29.     During the performance of the work called for by the subcontract, an employee of the subcontractor was injured when a pipe burst during a pressure test conducted by the general contractor.  St. Paul, 101 Cal.App.4th at 1045.  The injured employee was not involved in the pressure testing of the pipe, nor did the subcontract call for such testing.  Id.  Neither the subcontractor's nor its injured employee's conduct caused, or in any way contributed to, the bursting of the pipe.  Id.  Rather, the explosion resulted

---

[12] Notably, the indemnity agreement in this case does not include the italicized language.

entirely from activities in which the general contractor was separately and independently engaged.  Id.

30.     When the injured employee brought suit against the general contractor, railroad and others, the subcontractor's insurer denied coverage and refused a defense.  St. Paul, 101 Cal.App.4th at 1045.  The contractor's own insurer, St. Paul, provided a defense and settled the employee's lawsuit.  Id.  St. Paul and the general contractor then brought suit against the subcontractor and its insurer, seeking to recover the expenses they incurred in defending and settling the employee's lawsuit.  Id. at 1045-1046.  The trial court found in favor of the general contractor and St. Paul.  Id. at 1046-1047.

31.     The Court of Appeal reversed.  In interpreting the language of the subcontract agreement, the court stated that by expressly limiting the subcontractor's obligation to indemnify the general contractor to liabilities arising from an "act or omission" by the subcontractor during the performance of work called for under the subcontract, the parties intended "to limit the scope of [the subcontractor's] indemnity to injuries occurring in circumstances over which it has *at least some control* and where it is engaged in activity that is causally related in some manner to the injury for which indemnity is claimed."  St. Paul, 101 Cal.App.4th at 1052-1053 (emphasis added).  The court held that this precondition clearly did not exist, and therefore the duty to indemnify was never triggered, because the subcontractor "did *not* do *any* act that was in any way connected to [the] injury"; rather, the injury resulted from an explosion in a pipe being pressure-tested by the general contractor and its agents.  Id. at 1053-1055 (emphasis added).  The court reasoned that "[t]o construe the promise of indemnity made by [the subcontractor] as applying merely because its employee was present within the zone of danger created *solely* by the negligence of [the general contractor] would offend . . . the clearly expressed intent of the parties in . . . the Subcontract . . . ."  Id. at 1054.

32.     St. Paul is not controlling.  It involved different policy language.  Here, unlike in St. Paul, Reinhardt's duty to indemnify was not "expressly limited" to liability arising from its own acts or omissions.  See St. Paul, 101 Cal.App.4th at 1054, 1059.

Moreover, even assuming for the sake of argument that Reinhardt's duty to indemnify was so limited, the trial record establishes that the injuries to the Reinhardt roofers arose from acts and omissions by the subcontractor during the performance of work called for under the Subcontract.  At the time of the collapse, Reinhardt roofers were engaged in an activity called for by the Subcontract (i.e., removing the roofing membrane of the canopy), and it was that activity that led to the collapse and the injuries to the roofers.  SF ¶¶ 1, 22, 38; RT at 97:6-12, 103:23-104:1, 104:18-21, 115:1-6.  Further, the trial record establishes that the collapse occurred under circumstances over which Reinhardt had at least some control. Indeed, not only did Reinhardt accept responsibility for job site safety related to the roofing project, but its employee, Ramirez, also had the authority and responsibility (pursuant to company policy) to remove his crew from the canopy after observing the gap separating the canopy from the building to which it was attached.  See SF ¶ 23.  Accordingly, even if St. Paul controls as Plaintiff contends, Reinhardt's duty to indemnify was triggered because the injuries for which indemnity is claimed occurred under circumstances over which Reinhardt had "at least some control" while its employees were engaged in an activity that was "causally related in some manner" to the injuries.

33.     For the reasons discussed above, the Court finds that the collapse of the canopy arose out of and was connected with the performance of the work called for by the Subcontract.  Accordingly, the remaining issue is whether the injuries sustained by the Reinhardt roofers arose from the sole negligence of Hathaway.

### b.     Sole Negligence

34.     Defendant argues that because both DES and Reinhardt were contributorily negligent, the injuries sustained by the Reinhardt roofers did not arise from Hathaway's sole negligence.  Plaintiff disagrees, arguing that because Reinhardt was not negligent and because it is undisputed that Hathaway was negligent, Hathaway was solely negligent.  As discussed below, the Court finds that both DES and Reinhardt were negligent, and that the negligence of each, independently, establishes that the injuries sustained by the Reinhardt roofers did not arise from the "sole negligence" of Hathaway.

### i.    DES's Negligence

35.    As noted above, the parties stipulate that DES was concurrently and contributorily negligent along with Hathaway for the injuries to the Reinhardt roofers because neither DES nor Hathaway advised the roofers to get off the canopy.  See SF ¶ 40.

36.    "Negligence is generally defined as either the failure to do something that an ordinarily prudent person would do under given circumstances or the doing of something that an ordinarily prudent person would not do under those circumstances."  Cal. Civ. Prac. Torts § 1:1 (citing Witkin, 6 Summary of California L., Torts § 729 (9th ed.)).

37.    The Court finds that the parties' stipulation as to DES's negligence is supported by the trial record.  VanDerostyne testified that DES's on-site engineer (i.e., Tan) should have recognized the significant safety issue presented by the gap and advised Ramirez and his crew that it was unsafe to be on the canopy.  See RT at 106:15-21.  The Court finds that the applicable standard of care required Tan to immediately notify the roofers of this safety issue.  Because Tan failed to do so, DES fell below the applicable standard of care.  As such, DES was negligent.

38.    Although the parties agree that DES was negligent, they disagree as to the significance of DES's negligence.  Defendant contends that DES's negligence is properly considered in assessing whether the sole negligence exception in the indemnity agreement applies.  Plaintiff, on the other hand, contends that DES's negligence is irrelevant.  Plaintiff argues that only the negligence of the parties to the Subcontract (i.e., Reinhardt and Hathaway) can be considered in assessing whether Hathaway was solely negligent within the meaning of the indemnity agreement.

39.    In support of its position, Plaintiff cites Southern Pacific Transportation Co. v. Sandyland Protective Association, 224 Cal.App.3d 1494 (1990).  In Sandyland, a homeowners association entered into an agreement with a railroad company, Southern Pacific Transportation Company ("Southern Pacific"), under which the association agreed to construct and maintain a road across Southern Pacific's railroad tracks.  Id. at 1496.  The agreement included a clause in which the association agreed to indemnify Southern Pacific

and to hold it harmless against all claims arising out of the use of the road, " 'regardless of any negligence or alleged negligence on the part of [Southern Pacific].' " Id. at 1496-1497. Roughly ten years after the agreement was signed, two individuals filed a personal injury and property damage suit against Southern Pacific alleging they were injured when their car was struck while crossing Southern Pacific's tracks on the association's road, and that the accident was caused by the railroad's negligent operation and maintenance of the train, tracks, crossing and signaling devices. Id. at 1497. Southern Pacific cross-complained against the association for indemnity pursuant to the indemnity clause contained within the contract. Id.

40. The association moved for summary judgment, arguing the indemnity clause was unenforceable under California Civil Code § 2782(a), which states in part, "provisions, clauses . . . or agreements contained in, collateral to, or affecting any construction contract and which purport to indemnify the promisee against liability for damages . . . arising from the *sole negligence* or willful misconduct of the promisee . . . are against public policy and are void and unenforceable[.]" Cal. Civ. Code § 2782(a) (emphasis added). Sandyland, 224 Cal.App.3d at 1497. The trial court granted the association's motion for summary judgment based on the statute. Id.

41. In affirming the trial court, the Court of Appeal rejected Southern Pacific's argument that the limitation set forth in § 2782(a) was inapplicable because the injured plaintiffs had been concurrently negligent, and therefore the damages were not caused by the "sole negligence" of the promisee (i.e., Southern Pacific). Sandyland, 224 Cal.App.3d at 1948-1949. The court held that "[t]he manifest purpose of the Legislature in enacting section 2782 was to prevent one party to a construction contract from shifting the ultimate responsibility for its negligence to a nonnegligent party," and "[t]hat purpose would not be advanced by a construction of the statute that would allow a shifting of responsibility to a nonnegligent party upon a showing that the tort claimant and the promisee were comparatively negligent." Id. at 1948. The court construed the phrase "sole negligence . . . of the promisee" as used in § 2782(a) "to mean that as between the promisee and the

promisor, the promisee was solely negligent." <u>Id.</u>  The court held that "absent negligence on the part of the association, a party to the agreement, the negligence, if any, of the plaintiffs, who are third parties, is immaterial." <u>Id.</u> at 1498-1499.

42.     <u>Sandyland</u> does not control.  In that case, the issue was whether an indemnification provision was void.  The court determined that the provision was void because § 2782(a) renders void and unenforceable clauses in construction contracts that purport to indemnify the promisee against liability arising from its sole negligence.  Plaintiff does not contend that the indemnity agreement in this case is void under § 2782(a).  Indeed, the parties have stipulated that the Subcontract is "authentic, enforceable and its terms represent the intent of Reinhardt and Hathaway."  SF ¶ 10.  Moreover, any contention that the indemnity agreement is void under § 2782(a) would lack merit.  The indemnity agreement clearly and unambiguously provides that the indemnitor (i.e., Reinhardt) will *not* be responsible for indemnifying the promisee (i.e., Hathaway) against liability arising from Hathaway's sole negligence.  Thus, the indemnity agreement does not run afoul of "[t]he manifest purpose of the Legislature in enacting section 2782 [which] was to prevent one party to a construction contract [i.e., Hathaway] from shifting the ultimate responsibility for its negligence to a nonnegligent party [i.e., Reinhardt]."  <u>Sandyland</u>, 224 Cal.App.3d at 1498.

43.     To the extent Plaintiff contends that the <u>Sandyland</u> court's construction of the phrase "sole negligence" applies to the use of the phrase "sole negligence" in the indemnity agreement, the Court disagrees.  In <u>Sandyland</u>, the issue was the proper construction of language in a statute.  Here, by contrast, the issue is the proper construction of language in the indemnity agreement.  The relevant inquiry in interpreting the meaning of the phrase "sole negligence" as used in the context of the indemnity agreement is the intent of the parties as expressed by the language in the agreement.  See <u>Hartford</u>, 123 Cal.App.4th at 290 (" '[T]he question whether an indemnity agreement covers a given case turns primarily on contractual interpretation, and it is the intent of the parties as expressed in the agreement that should control.' "); <u>Smoketree-Lake Murray, Ltd. v. Mills Concrete Construction Co.</u>,

234 Cal.App.3d 1724, 1737 (1991) ("In interpreting an express indemnity agreement, the courts look first to the words of the contract to determine the intended scope of the indemnity agreement."); see also Centex, 78 Cal.App.4th at 996-997.  Plaintiff has not proffered any authority or legal analysis demonstrating that the Sandyland court's construction of "sole negligence" in the context of § 2782(a) is germane to this inquiry. Indeed, the meaning the Legislature has attached to words in a statute does not control the meaning of the same words in a private agreement.  See Los Angeles County v. Southern Cal. Gas Co.,184 Cal.App.2d 169, 175 (1960) ("The statutory definition of 'highway,' as referred to in [a] statutory provision, does not necessarily apply to the use of the word 'highway' as used in the county franchise, which is in effect a contract (as distinguished from a statutory provision).").

44.     Contrary to Plaintiff's suggestion, the question of whether DES's negligence is properly considered in assessing whether the sole negligence exception in the indemnity agreement applies must be resolved by the principles applicable to contract interpretation. As set forth above, the express terms of the indemnity agreement provide that Reinhardt shall indemnify Hathaway of and from any and all claims or liabilities "arising out of or in any way connected with or incidental to the performance of the work under the Subcontract."  SF ¶ 13, Exh. C at 50.   Reinhardt's duty to indemnify, however, is not triggered with respect to any "loss, damage, or expense arising from the *sole negligence* or willful misconduct of [Hathaway], [its] agents, servants, or independent contractors who are directly responsible to [Hathaway][.]"  Id. (emphasis added).

45.     The Court finds that the scope of the indemnity agreement is broad, and that Hathaway was entitled to indemnification from Reinhardt unless the injuries in question arose from the "sole negligence" or willful misconduct of Hathaway or those directly responsible to Hathaway.  See Continental Heller, 53 Cal.App.4th at 505 (interpreting substantially similar language as the language at issue in this case and concluding that "[t]he language of the agreement leaves no doubt the parties intended [the subcontractor] should indemnify [the general contractor] irrespective of whether [the general contractor's]

loss arose by reason of [the subcontractor's] negligence *or for any other reason* except the sole negligence or willful misconduct of [the general contractor].") (emphasis added). Plaintiff does not contend that the injuries at issue were caused by the willful misconduct of Hathaway or those directly responsible to Hathaway.  Thus, as relevant here, the Court finds that the clear and plain language of the indemnity agreement means that if any party other than Hathaway or those directly responsible to Hathaway—including third parties that are not a party to the Subcontract—was negligent in connection with the injuries sustained by the Reinhardt roofers, then the injuries did not arise from the "sole negligence" of Hathaway.  Plaintiff has not pointed to any language in the indemnity agreement or cited any authority supporting a contrary construction of the phrase "sole negligence." Accordingly, because DES was negligent, the injuries to the Reinhardt's roofers did not arise out of the "sole negligence" of Hathaway or those directly responsible to Hathaway.

### ii.    Reinhardt's Negligence

46.    Even assuming, as Plaintiff argues, that only the negligence of the parties to the Subcontract (i.e., Reinhardt and Hathaway) can be considered in assessing whether Hathaway was solely negligent, Hathaway was not solely negligent for the injuries sustained by the Reinhardt roofers because Reinhardt was negligent.

47.    At trial, Milo testified that Reinhardt fell below the standard of care by failing to properly train Ramirez to conduct daily job site safety inspections at the beginning and end of each work day to identify potentially dangerous conditions.  RT at 126:2-11, 130:5-131:3.  Milo also testified that Reinhardt fell below the standard of care because Ramirez failed to remove his crew from the canopy after observing the gap between the canopy and the building to which it was attached.  Id. at 126:2-11, 161:2-3, 165:3-7.

48.    Milo's testimony regarding the standard of care for roofer safety in California is uncontroverted.   Because Plaintiff presented no evidence at trial contradicting or calling into question Milo's testimony, and because the Court has no reason to doubt Milo's credibility, the Court found Milo's testimony compelling and gives Milo's uncontradicted testimony significant weight.

49.      In an attempt to undermine Milo's testimony, Plaintiff contends that Milo's testimony was inconsistent.  The Court disagrees.  In support of its position, Plaintiff points to the fact that Milo testified that roofer training programs and safety meetings typically focus on roof stability and ensuring that workers do not fall off the edge, not the underlying structural integrity of the roof.  In doing so, Plaintiff suggests that Milo's conclusion that Ramirez should have identified the gap as a potential safety hazard is unfounded.  Milo, however, testified that his opinion that Reinhardt fell below the standard of care was not based on the assumption that Ramirez understood the structural issues underlying the canopy.  Rather, Milo opined that Reinhardt fell below the standard of care as Ramirez should have recognized the gap as a potential safety hazard because:  (1) he observed that no other canopy had such a gap; (2) he was ordered by Fox to have his men spread out on the canopy; and (3) the gap caused him enough concern to notify both Carrasco and Fox about it.  RT at 162:3-165:7, 169:8-13, 180:13-16.

50.      Contrary to Plaintiff's contention, Milo's opinion that Ramirez should have recognized the gap as a potential safety hazard is not inconsistent with his statement that roofing foremen are not typically trained to assess the structural integrity of the roofs on which they work.  Even without an understanding of the structural engineering concepts underlying the gap, Ramirez was on notice that the gap separating the canopy from the wall of the building—a striking difference from the other canopies Ramirez had observed— presented a potentially dangerous situation.

51.      Plaintiff also contends that Milo's testimony conflicts with the testimony of VanDerostyne.  Again, the Court disagrees.  Plaintiff states that VanDerostyne "testified that he would not expect a roofer to appreciate that the gap . . . posed a danger to the roofers."  Plaintiff misconstrues VanDerostyne's testimony.  VanDerostyne testified that he did not believe that a roofer "would recognize and be able to evaluate" the structural integrity of a canopy; specifically, the ability of the canopy to remain attached to the wall. RT at 195:17-22.  As previously explained, regardless of whether Ramirez understood the engineering concepts underlying the gap, he was on notice that the gap presented a

potential safety hazard.  Therefore, Milo's opinion that Ramirez should have recognized the gap as a potential safety hazard is not inconsistent with the testimony of VanDerostyne.

52.     The Court finds that while Ramirez may not have understood the structural issues underlying the cause of the gap, under the applicable standard of care, he should have recognized the gap as a potential safety hazard and ordered his crew off the canopy.  It is undisputed that Ramirez failed to do so.  Reinhardt thus fell below the standard of care through Ramirez's failure to order his men off the canopy, and this failure constitutes negligence.

53.     The Court further finds that Reinhardt fell below the standard of care in failing to train Ramirez to conduct daily job site safety inspections.  It is undisputed that Reinhardt did not train Ramirez to conduct such inspections, and that Ramirez did not conduct any safety inspections of the canopy.  See SF ¶¶ 25-27.  Reinhardt's failure in this regard constitutes negligence.

### c.     Cal-OSHA Citation

54.     At the close of trial, Plaintiff sought to admit a citation issued to Hathaway after the accident by Cal-OSHA and the Cal-OSHA inspection report related to the accident.[13]  Plaintiff sought to admit these documents to undermine Milo's testimony and to demonstrate that Hathaway was solely negligent.  Plaintiff did so despite the fact that Plaintiff failed to lay a proper foundation to authenticate these documents.  Plaintiff's counsel indicated that he had intended to introduce the documents through the testimony of Dolan, who the Court determined lacked the requisite qualification to testify as an expert in this case.  In light of Defendant's objection to the admissibility of these documents, the Court permitted the parties to address this issue in their post-trial briefs.

55.     Having reviewed Plaintiff's post-trial brief, the Court finds that Plaintiff has failed to demonstrate that the Cal-OSHA citation or the Cal-OSHA inspection report is

---

[13] State of California, Division of Occupational Safety and Health ("Cal-OSHA").

1   admissible.  Plaintiff did not cite any authority or provide any legal analysis establishing

2   that either of these documents is admissible.

3       56.     To the extent Plaintiff requests the Court take judicial notice of the Cal-

4   OSHA citation and the Cal-OSHA inspection report, the Court finds that while it may take

5   judicial notice of the existence of these documents, it may not take judicial notice of the

6   disputed facts contained therein.  See Arnett v. Seaside Transportation Services, LLC, 2014

7   WL 117325, at *2, n. 3 (N.D. Cal. 2014) (taking judicial notice of the fact of the OSHA

8   report but not the disputed facts contained therein) (citing Lee v. City of Los Angeles, 250

9   F.3d 668, 690 (9th Cir. 2001) (court erred when it "took judicial notice of disputed facts

10  stated in public records")); see also U.S. v. S. Cal. Edison Co., 300 F.Supp.2d 964, 974

11  (E.D. Cal. 2004) ("A court can only take judicial notice of the existence of those matters of

12  public record . . . but not of the veracity of the arguments and disputed facts contained

13  therein.").  Moreover, even if the Court were to consider the contents of the Cal-OSHA

14  citation and the Cal-OSHA inspection report, these documents do not establish that

15  Hathaway was solely negligent for the injuries arising out of the collapse of the canopy.

16  The documents relate to whether certain standards, rules, orders, or regulations set forth in

17  Title 8 of the California Code of Regulations or Division 5 of the California Labor Code

18  have been violated.  Plaintiff has not shown how these documents prove that Reinhardt was

19  not negligent.  That aside, there is ample evidence before the Court demonstrating that

20  Reinhardt was negligent for the injuries for which indemnity is claimed.

### d.     Conclusion

22      57.     In sum, the Court concludes that the indemnification agreement entered into

23  between Reinhardt and Hathaway precludes Plaintiff from recovering against Defendant.

24  The injuries sustained by the Reinhardt roofers arose out of and were connected with the

25  performance of the work called for by the Subcontract.  Further, the injuries did not arise

26  from the sole negligence of Hathaway.  Accordingly, because Hathaway is not liable to

27  Reinhardt under the terms of the indemnity agreement, Hathaway's insurer (i.e., Defendant)

28  is not liable to Reinhardt's insurer (i.e., Plaintiff) for any amount Plaintiff incurred in

defending Hathaway in the Ramirez Action.  See Hartford, 123 Cal.App.4th at 289-292 (where the indemnity obligations of a subcontractor have been triggered, requiring the subcontractor to indemnify the general contractor, the subcontractor's insurer is precluded from recovering from the general contractor's insurer under equitable principles or insurance policy provisions).  Plaintiff's equitable claims are therefore without merit.  To hold otherwise would negate the indemnity agreement and impose liability on Hathaway's insurer when Hathaway bargained with Reinhardt to avoid that very result as part of the consideration for the Subcontract.  See id. at 292; see also Rossmoor, 13 Cal.3d at 633-634. ("When the parties knowingly bargain for the protection at issue, the protection should be afforded.").

## V.      CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED THAT, in accordance with this Order, final judgment shall be entered in favor of Defendant and against Plaintiff. The Clerk shall close the file and terminate any pending matters.

IT IS SO ORDERED.

Dated: September 30, 2014

SAUNDRA BROWN ARMSTRONG
Senior United States District Judge